OPINION
{¶ 1} Appellant, Paula Ferrell, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion of Franklin County Children Services ("FCCS") for permanent custody of appellant's minor son, M.L.J. Because the trial court properly granted permanent custody of M.L.J. to FCCS, we affirm.
 {¶ 2} M.L.J. was born on July 7, 2001 to appellant and her husband, Martin. Shortly after M.L.J.'s birth, FCCS was notified pursuant to a neglect referral that the living conditions for the child were unsanitary and inappropriate. After an investigation supported a neglect finding, M.L.J. was voluntarily removed from appellant's residence and was placed with a relative to allow appellant and her husband to remedy the living conditions. Although M.L.J. was returned to the home, FCCS ultimately filed a motion on October 25, 2001 seeking temporary custody of M.L.J., describing the living conditions of appellant's home as "deplorable," and reporting that one of the other adults living in appellant's home kicked M.L.J. as the child was sleeping on the floor. The trial court issued an emergency care order the same day and followed it with an award of temporary custody to FCCS premised on a finding that M.L.J. was a neglected and dependent minor. M.L.J. was placed in the care of foster parents, who have provided him a home, support, and medical attention to the present time.
 {¶ 3} On May 29, 2002, FCCS moved for permanent custody of M.L.J. pursuant to R.C. 2151.413. According to FCCS' motion, permanent commitment was in the best interest of M.L.J. because the child could not be placed with either of his parents within a reasonable time or should not be placed with them. The trial court held an evidentiary hearing on FCCS' motion for permanent custody of M.L.J. on October 9, 2003. At the conclusion of the first day of hearing, the matter was continued to January 7, and following three days of hearing, it concluded on January 9, 2004. On January 15, 2004, the trial court issued its decision and journal entry finding by clear and convincing evidence that placing M.L.J. in the permanent custody of FCCS and terminating appellant's and her husband's parental rights was in M.L.J.'s best interests. Appellant's husband, M.L.J.'s father, does not appeal the trial court's judgment. In her appeal, appellant assigns the following errors:
ASSIGNMENT OF ERROR NO. 1
The trial court erred in granting an award of Permanent Court Commitment to Franklin County Children Services without making specific findings of fact.
ASSIGNMENT OF ERROR NO. 2
In considering the quality and timeliness of Appellant's compliance with the case plan, the trial court did not give due consideration and accommodation to Appellant's MRDD disability.
ASSIGNMENT OF ERROR NO. 3
The trial court's decision granting an award of Permanent Court Commitment to Franklin County Children Services was against the manifest weight of the evidence.
 {¶ 4} Appellant's first assignment of error contends the trial court erred in not issuing findings of fact to support its decision that terminating appellant's parental rights and placing M.L.J. in the permanent custody of FCCS is in M.L.J.'s best interest. Subsequent to appellant's brief, however, the record was supplemented with the trial court's findings of fact, and, accordingly, appellant has withdrawn her first assignment of error.
 {¶ 5} Appellant's second and third assignments of error are interrelated and will be addressed jointly. Together they assert the trial court's judgment is against the manifest weight of the evidence, including the trial court's failure to appropriately deal with appellant's "MRDD disability."
 {¶ 6} In considering the trial court's decision, this court must determine whether the record contains the requisite evidence to satisfy the clear and convincing standard. In re Wise
(1994), 96 Ohio App.3d 619, 624. Clear and convincing evidence requires that the proof "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re Coffman (Sept. 7, 2000), Franklin App. No. 99AP-1376, citing Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 7} In resolving FCCS' motion for permanent custody of M.L.J., the trial court concluded "[t]he evidence is clear and convincing. Reasonable efforts were made by the Franklin County Children's Services to prevent the continued removal of [M.L.J.] from the home, and to finalize the permanency plan. The child has been in the custody of FCCS for more than twelve of a consecutive twenty-two month period. (The child cannot or should not be placed with either of the parents within a reasonable time as both parents have failed, refused or neglected to comply with the provisions of the case plan for reunification despite given time and the referrals to do so, and failed, refused or neglected to remedy the conditions that led to the child's removal. * * *)." (Findings of Fact, at 10-11.) Because the trial court analyzed the case under both R.C. 2151.414(B)(1)(a) and (d), we do likewise.
A. R.C. 2151.414(B)(1)(a).
 {¶ 8} Under R.C. 2151.414(B)(1)(a), the trial court determined that M.L.J. could not or should not be returned to his parents. The trial court premised its determination on appellant's failure to successfully complete many of the significant elements of her case plan, despite opportunities to do so. See In re Brofford (1992), 83 Ohio App.3d 869, 878
(concluding that "[n]on-compliance with the case plan is a ground for termination of parental rights"); In re Bailey (July 20, 2001), Geauga App. No. 2001-G-2340 (noting that non-compliance with a case plan is a basis for terminating parental rights, as "the case plan's objectives are geared toward remedying the conditions that initially caused the child's removal"). The evidence of record supports the trial court's determination.
 {¶ 9} Pursuant to the case plan created for appellant and her husband, they both were seen by a psychologist, Dr. Randy Shively, and were to follow his recommendations. As a result of his examination, he determined appellant has an IQ of 55 and operates in a mild range of intellectual deficit, or mental retardation. Similarly, her husband, with an IQ slightly higher than appellant's, has a mild intellectual deficit. Appellant, however, also exhibits problems with anger and patience that affect her perception of appropriate discipline, and she suffers from what Dr. Shively termed "intermittent explosive disorder." Dr. Shively recommended that appellant undergo anger management training, seek medication review to address her impulsivity and difficulty getting along with others, and obtain help from a care provider regarding M.L.J., as the child was difficult for appellant to handle alone. For Martin, Dr. Shively recommended full-time employment, a home for him and appellant separate from the home of appellant's mother, Linda Dotson, family counseling regarding domestic violence issues, and urine drops to address Martin's past substance abuse.
 {¶ 10} Addressing those issues, the case plan required appellant and her husband to take parenting classes, as both evidenced limited parenting skills and an inability to meet M.L.J.'s needs. As a result of the parenting classes, both appellant and her husband improved in their ability to parent M.L.J. Unfortunately, despite appellant's temporary improvement, she would revert to her former ways, as when, during a visitation session, she taught M.L.J. to curse. Linked to that facet of appellant's personality, the case plan required appellant and her husband to take anger management classes. Appellant failed to do so, testifying she had no counseling directed to her violent behavior, her past history of abuse, interfamily relations, or the effect of her actions on her child's safety. Her husband also failed to complete anger management classes because, as of about five months prior to the conclusion of the hearing in the trial court, he began working 60 to 70 hours per week and had not completed classes prior to obtaining employment.
 {¶ 11} The case plan also required economic stability through regular income for appellant and her husband Appellant's husband was able to find a job he enjoyed. Thus, "despite his limited intellectual functioning and his felony convictions, [appellant's husband has] been able to obtain and maintain employment for five months with which he supports himself and [appellant]. As a result of his employment, [appellant] no longer receives SSI." (Findings of Fact, at 6.)
 {¶ 12} Another part of the case plan required appellant and her husband to maintain stable housing. At the time M.L.J. was removed from their care, they lived in Dotson's four-bedroom, one bath home which they shared with approximately ten adults. The home was roach infested, and the inhabitants were lice infected. Appellant and her husband slept on a mattress in the basement. M.L.J. also slept at times on a mattress on which dogs had urinated and defecated, and while he was there an adult in the house accidentally kicked him in the head. Evidence indicated the house generally was filthy.
 {¶ 13} Witnesses almost uniformly testified to the chaotic nature of life in the home. The residents continually were arguing and screaming at each other, and at times their arguments erupted into physical violence. Among the residents was a convicted sex offender, although at least some of the residents of the home, including appellant, believed he had been wrongly charged.
 {¶ 14} As a result of appellant's husband's employment, on December 20, 2003, appellant and her husband were able to leave her mother's home, the conditions of which had prompted M.L.J.'s removal, and establish their own residence in half of a duplex. Although appellant's sister and her boyfriend originally moved in with them, appellant ordered them out of the home prior to trial in an effort to further her ability to regain custody of M.L.J.
 {¶ 15} The evidence thus reveals appellant's husband progressed in meeting some of the terms of the case plan. He sought and obtained employment with Columbus Casting Steel that allowed him to obtain and maintain stable housing, at least from December 20, 2003 until the trial resumed on January 7, 2004. The unfortunate aspect of this case, however, lies in the fact that, to accomplish both of those goals, appellant's husband works from 4:00 p.m. to at least midnight, but often until 3 o'clock in the morning. Thus, although he shows better judgment with respect to M.L.J. and has advanced in his efforts to meet the case plan, he is unavailable to care for M.L.J. Instead, he believes appellant would be a suitable caregiver for their child. Appellant's failure to complete anger management classes undermines that plan for M.L.J.'s care.
 {¶ 16} Appellant was required to complete anger management classes as part of the case plan because of her physical and verbal outbursts over the years involving family, neighbors, and FCCS employees. Appellant long ago was prescribed Ritalin and Depakote, but at trial she testified she had not taken the medication for some time, believing she did not need it. Her husband agreed that they got along better when she did not take her medication. Absent the medication, appellant purportedly has been involved in incidents of throwing telephones, threatening FCCS employees, threatening to remove M.L.J. from his foster home, threatening to harm herself by cutting herself with a knife or by overdosing on pills, throwing a screwdriver at a nine-year-old girl, and pushing or shoving another client of FCCS during visitation with M.L.J., with some evidence of occasional domestic violence between appellant and her husband that appellant contended was horseplay. As a result of her intermittent explosive disorder, appellant suffered from poor abstract reasoning, a bad temper, little control over her words, and a limited understanding of her situation. Indeed, evidence indicated that although appellant's husband gained some insight and taken responsibility for M.L.J.'s situation, appellant failed to reach that insight and continued to lack understanding about why M.L.J. was taken from her.
 {¶ 17} Given appellant's situation and her failure to engage in anger management classes, clear and convincing evidence supports the trial court's conclusion that, in the absence of anger management classes and medication review, appellant is not a safe caregiver for M.L.J. Moreover, given her husband's working hours and inclination to allow appellant to care for their child, the trial court reasonably could conclude by clear and convincing evidence that the child could not be returned to appellant or her husband, as appellant posed a danger to the child with her explosive personality, and her husband persisted in his belief that M.L.J. would be safe with appellant. While appellant's husband was willing to consider daycare to address M.L.J.'s care while he was working, the couple lacked the resources to fund such care, and no other viable alternative was evident at trial.
 B. R.C. 2151.414(B)(1)(d). {¶ 18} The record shows, and the parties do not dispute, that M.L.J. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999. Accordingly, R.C. 2151.414(B)(1)(d) is met as well.
 C. The Best Interests of the Child. {¶ 19} Because the trial court properly concluded the evidence met the statutory requirements of R.C. 2151.414(B)(1)(a) and (d), the trial court was obligated to assess the best interest of M.L.J., which is determined by considering the factors set forth in R.C. 2151.414(D) under the facts of this particular case. In re Thompson, Franklin App. No. 02AP-557, 2003-Ohio-580, appeal not allowed, 98 Ohio St.3d 1515,2003-Ohio-1572, citing In re Williams, Franklin App. No. 02AP-924, 2002-Ohio-7205, at ¶ 48-49.
 {¶ 20} In determining the best interest of the child in accordance with R.C. 2151.414(D), a trial court is required to consider all relevant factors including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
Premised on those provisions, the trial court concluded M.L.J.'s best interest was served by granting permanent custody of him to FCCS. Again, clear and convincing evidence supports the trial court's conclusion.
 {¶ 21} Specifically, although M.L.J. was able to interact adequately with appellant and her husband and showed at least some superficial bonding with them, the evidence clearly showed M.L.J. regards his foster parents as his parents and looks to them for support, encouragement and fulfillment of his basic needs. He has bonded with them and responds to their presence. Moreover, they address his medical needs. At the time of his placement with the foster parents, M.L.J. suffered from glaucoma, purportedly induced as a result of the stress he endured in living in the Dotson home. He also undergoes occupational therapy and physical therapy, as well as speech therapy because his speech is slow in developing. The foster parents have maintained the appropriate schedule of therapy for him and are seeing that he receives the necessary medical assistance. R.C.2151.414(D)(1).
 {¶ 22} Unable to express himself adequately, M.L.J. cannot announce his own wishes, but the guardian ad litem recommended that permanent custody be granted to FCCS. Cf. R.C.2151.414(D)(2). According to the guardian ad litem, appellant was not a suitable caregiver for M.L.J. because she had not completed the necessary counseling. Similarly, the guardian ad litem found Dotson to be unsuitable, as some of the same adults who had presented the problems prompting M.L.J.'s removal from the Dotson home remained there, and the living conditions were unknown due to Dotson's refusal to allow the guardian ad litem to inspect the house immediately before trial. Indeed, Dotson's residence was uncertain at the time of trial, as her home was in foreclosure. Moreover, the guardian ad litem deemed appellant's new home to be unsuitable, as the basement was a fire hazard, and unsafe steps led to the second floor. The guardian ad litem further noted the parents had no furniture for M.L.J., had a record of only three weeks of maintaining independent housing, and were unable to arrange for the daycare that would be necessary to allow appellant's husband to maintain employment. According to the guardian ad litem, appellant's husband could not provide for the child on his own, but needed a "significant other" to help him. He would not separate from appellant, and appellant felt she was the one to take care of M.L.J. Accordingly, the guardian ad litem recommended permanent custody to FCCS.
 {¶ 23} Last, M.L.J. needs a legally secure placement that may include adoption, as appellant and her husband, despite their love for M.L.J., are unable to care for the child. The foster parents are a possible adoptive placement, and permanent custody would allow such a placement for M.L.J.R.C. 2151.414(D)(4).
 {¶ 24} Despite the foregoing, appellant contends the trial court is punishing her for her low intellectual functioning. Quite to the contrary, the trial court clearly defined the inadequacies which prompted its decision: appellant's failure to engage in anger management classes despite her behavior toward family, neighbors, case workers, other clientele of FCCS, and even children. In addition, the trial court explained that, although she had been prescribed medication to address some of her behavioral difficulties, appellant consistently refused to take the medication. Nothing in the trial court's opinion suggests appellant's behavior arises out of the level of her intellectual functioning. Rather, the case plan, as well as the trial court, recognized that appellant, with proper counseling, could achieve the level of emotional stability necessary to care for M.L.J., but appellant refused to pursue the course outlined in the case plan.
 {¶ 25} In summary, competent evidence establishes appellant failed to demonstrate a substantial compliance with the case plan and thereby failed to demonstrate that she could provide a stable, secure and permanent home for M.L.J. that would permit reunification of M.L.J. and appellant. Further, the evidence is clear and convincing that M.L.J.'s best interests are served by placing him in the permanent custody of FCCS, thus facilitating his adoption and thereby providing him with needed permanency in his life.
 {¶ 26} For the foregoing reasons, appellant having withdrawn her first assignment of error, we overrule appellant's second and third assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
Bowman, Bryant and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.