JOURNAL ENTRY AND OPINION
{¶ 1} In these consolidated appeals, R.F. appeals judgments of Visiting Juvenile Court Judge Joseph J. Nahra that granted permanent custody of her three children to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). She claims the judge erred in finding that she failed to remedy the conditions that caused her children to be removed from her custody and, therefore, could not be placed with her. We affirm.
 {¶ 2} In July 1999, CCDCFS took emergency temporary custody of then five-year-old V.F. and then seventeen-month-old A.F., because of reports that they were in an unsafe, unsanitary home. CCDCFS moved for temporary custody alleging that then thirty-three-year-old R.F.'s home was unhealthy and unsafe because there were "[d]ead birds outside the home, and dried human feces on the training toilet, dirty clothing, toys strewn throughout the house, [and a] backed-up sink in the home." The complaint further stated that there were "numerous physical hazards[,]" including "a door off its hinges blocking access to and from the back door." In addition, it noted that V.F. had been removed for similar reasons between January 1998 and April 1998, and was still under protective supervision of CCDCFS.
 {¶ 3} In August 1999, Magistrate Mark Majer found the children neglected under R.C. 2151.03, and granted temporary custody to CCDCFS. No objections were filed, and Judge Joseph Russo apparently adopted the decision in a journal entry filed on May 31, 2000,[1] although that order stated only that "[t]he order heretofore made committing children to the temporary custody of CCDCFS is continued in effect." No case plan was filed, and it appears that case reviews referred to an earlier case plan prepared after V.F.'s removal in 1998.[2] The reviews performed in December 1999 and June 2000 indicated that R.F. had attended parenting classes and made progress in making the home safer, but she needed a psychological evaluation and needed to participate in counseling for V.F., whose behavior showed signs of having been sexually abused.[3]
 {¶ 4} Temporary custody was extended[4] to allow R.F. to continue work on her case plan, but in December 2000 a case review again stated that the home was not safe, that she had not been involved in counseling to keep her children safe from sexual abuse, and that her psychological evaluation showed mental health problems. The report recommended that a motion for permanent custody be filed, because of her "inconsistency" in providing a suitable environment for her children. In January 2001, CCDCFS moved to modify temporary custody to permanent custody.
 {¶ 5} A case plan review filed in May 2001 indicated that R.F.'s home remained in poor condition, that she was not participating in counseling, and that she was not cooperating with social workers.
 {¶ 6} R.F.'s assigned case worker, Mary Ann Chicwak, discovered T.L. when she made a visit to R.F.'s home in early October 2001. At that time, R.F. stated that she was babysitting the infant, but Chicwak became suspicious and learned, through later investigation, that R.F. had given birth to a daughter in June 2001.
 {¶ 7} On October 29, 2001, CCDCFS filed a complaint seeking a finding of neglect and an award of permanent custody concerning then four-month-old T.L. The complaint alleged that R.F. had concealed T.L.'s birth in order to prevent the agency from investigating her well-being, and that she had been "evasive and uncooperative with CCDCFS." It further alleged that R.F. was using marijuana while breast feeding T.L., and that the unsafe, unsanitary conditions of her home continued to exist. It does not appear that a separate case plan was filed for T.L., although case reviews were filed.
 {¶ 8} The case concerning V.F. and A.F. was also continued throughout 2002, apparently pending the service on W.L. and T.L.'s neglect adjudication. The dispositional hearings for both cases were consolidated and held on February 26, 2003, April 28-29, 2003, and October 7, 2003. At the February 2003 hearing, it appeared that W.L. was living with R.F., and that he intended to participate in T.L.'s care. But by the time of the hearings in October 2003, W.L. had left R.F., was living with another woman, and he was seeking custody of T.L. himself. In addition, T.L.'s foster parents filed a motion for legal custody under R.C.2151.353(A)(3), and participated in the hearings.
 {¶ 9} On October 23, 2003, Judge Nahra granted permanent custody of all three children to CCDCFS, and R.F. states a single assignment of error,[5] as follows:
{¶ 10} "The Juvenile Court committed error to the prejudice ofthe appellant contrary to the manifest weight of the evidence indetermining a grant of permanent custody to ccdcfs to be in thebest interest of the child."
 {¶ 11} Because a juvenile custody proceeding concerns important rights deserving of more scrutiny than the ordinary civil proceeding,[6] we review a manifest weight challenge under the criminal standard, which requires us to determine "whether the evidence produced attains the high degree of probative force and certainty required * * *."[7] Instead of the reasonable doubt standard employed in criminal cases, we must determine whether the evidence reasonably supports the "clear and convincing evidence" standard required for permanent custody determinations.[8]
 {¶ 12} We review the entire record and assess the credibility of witnesses, the quality of evidence, and the inferences that can reasonably be drawn from the evidence,[9] and we will remand for a new trial if it appears that the finder of fact misconstrued the evidence, drew unreasonable inferences, or otherwise "lost its way" in rendering its verdict.[10]
Under the manifest weight test, a new trial should not be ordered unless the evidence weighs so heavily against the judgment that it appears unjust.[11]
 {¶ 13} The motion and complaint for permanent custody in these cases was governed by R.C. 2151.414(B)(2), which requires the judge to grant permanent custody to the movant if he determines, by clear and convincing evidence, "that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines * * * that permanent custody is in the child's best interest." The judge must consider the factors outlined in R.C.2151.414(D) to determine the child's best interest, and must consider the factors of R.C. 2151.414(E) in determining whether a child can be placed with its parents. If the judge finds any one of the factors listed in that division, he is required to find that the child cannot be placed with the parent.
 {¶ 14} Among other things, the judge found, under R.C.2151.414(E)(1), that R.F. and, in the case of T.L., her father, W.L., had failed continuously and repeatedly to remedy the conditions that caused the children to be removed. R.F. claims this finding is against the weight of the evidence because testimony at the hearing showed that she had made progress in complying with her case plan. She presented evidence that showed she had made substantial improvements to her home, that she had attended and completed parenting classes, and that she was attending individual counseling to improve her emotional stability. She also notes that there was no evidence that she was using marijuana, because drug testing of both her and T.L. revealed no marijuana residue.
 {¶ 15} CCDCFS witnesses admitted that the allegations of substance abuse were unproven, and R.F. is correct in stating that the evidence at the hearings showed that she had made progress on her case plan in the years 2002 and 2003. However, there was also evidence that she failed to make progress throughout the year of 2001. Ms. Chicwak testified that she had a history of only temporary compliance with orders to clean her home, but that she had not shown the ability to consistently maintain her home in a clean and safe condition.
 {¶ 16} The testimony and the record of case reviews revealed that V.F. had been removed in January 1998 because of R.F.'s failure to maintain appropriate living conditions at her home, that she had sufficiently corrected the situation to regain custody in April 1998, but that her house had again sunk to a "deplorable" condition by July 1999. Cheryl Hudson, who worked as a CCDCFS parent aide, testified that when she went to assist R.F. in cleaning her home, there were piles of newspapers and old furniture creating safety and fire risks, plumbing and structural disrepair, and garbage and dirty dishes in the house that attracted flies, bugs, and mice.
 {¶ 17} The evidence showed that R.F. had made some progress in making her home habitable during the year 2000, but that the home again became disheveled during the year 2001. Ms. Chicwak testified that the home was again in a deplorable condition when she went to visit, and discovered T.L. there, in October 2001, and she took photographs documenting some of the conditions in the home in November 2001. Chicwak testified that R.F. was frequently late for, or failed to attend, her parenting classes and counseling sessions, and the May 2001 case review states that R.F. was uncooperative with social workers. Her failure to cooperate was also shown by her claim that she was only babysitting for T.L. when the child was discovered in her home, and her statements that she did not know who T.L.'s father was, even though W.L. had signed her birth certificate as the father.
 {¶ 18} Chicwak and others also testified that R.F. did not adequately address V.F.'s developmental problems, including her sexual "acting out" and her developmental problems, which eventually were diagnosed as symptomatic of autism. Elizabeth Miller, a social worker with the Christian Children's Home in Wooster, Ohio, testified that R.F. believed that V.F.'s sexual behavior[12] was normal for a child her age, and Chicwak testified that R.F. did not initially believe that V.F.'s lack of progress in school warranted any special attention.
 {¶ 19} Frank R. Ezzo, M.D., a psychiatrist, examined R.F. and testified that she suffered from a passive-aggressive personality disorder,[13] and he characterized the disorder as "Access 2," meaning that he believed the condition to be "chronic and resistant to change." He testified that R.F.'s disorder would be difficult to treat, but that she could benefit from therapy and, possibly, medication. Dr. Ezzo testified that the passive-aggressive personality disorder "is characterized by pervasive negative attitudes and passive resistance to change * * *." He stated that persons with the disorder exhibit, among other things, "persistent complaining of a person's misfortune and alternating expression of hostility and constriction." He stated that the disorder would affect the ability to provide appropriate parenting, but that such a person could be a fit parent. However, he gave no opinion concerning whether R.F. was capable of properly caring for her children, because he was not aware of whether she was undergoing any treatment.
 {¶ 20} The evidence presented allows a reasonable inference that R.F. was unable to consistently provide a stable environment for her children, and the judge reasonably could find that clear and convincing evidence showed her inability to remedy the conditions that caused the removal of her children. The judge reasonably could have found that R.F. was not sufficiently capable of maintaining a stable home because she allowed her home to lapse into extreme disrepair and uncleanliness between 1998 and 1999, after the first removal of her children, and because she failed to remedy and maintain the situation between 1999 and 2001, when she was again required to show the ability to maintain suitable living conditions in order to be reunited with V.F. and A.F.
 {¶ 21} The judge also could have considered R.F.'s behavior in October 2001 as indicative of an inability to make reasoned judgments. At that time, she was caring for T.L. in an environment deemed unfit for her other children, and she had failed to make appropriate efforts to clean and repair the home so that it would be fit for any of the children, whether present or absent. The judge reasonably could have concluded that R.F.'s personality disorder hindered her from making substantial, permanent changes in her living conditions and her attitudes toward parenting, and that this hindrance prevented a finding that she could be reunited with her children.
 {¶ 22} On the evidence presented, the finding that the children could not be placed with R.F. is not against the manifest weight of the evidence. It follows, therefore, that the finding that a grant of permanent custody to CCDCFS was in the child's best interest is also supported by the evidence. The assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee shall recover of appellant costs herein taxed.
The court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., and Rocco, J., concur.
[1] The order was not filed until May 31, 2000, but states that it is the result of a hearing held on February 1, 2000.
[2] A case plan eventually was prepared on October 5, 2001, and filed on October 12, 2001.
[3] V.F. was eventually diagnosed as autistic, and the root of her behavior in sexually "acting out" has not been identified.
[4] R.C. 2151.415.
[5] Neither W.L. nor T.L.'s foster parents have appealed.
[6] See, e.g., In re Heston (1998), 129 Ohio App.3d 825, 827,719 N.E.2d 93, 95 (right to effective assistance of counsel).
[7] State v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-533,702 N.E.2d 866.
[8] R.C. 2151.414(E).
[9] State v. Lindsey, 87 Ohio St.3d 479, 483, 2000-Ohio-465,721 N.E.2d 995.
[10] Lindsey, supra (citation omitted).
[11] Id.
[12] Witnesses testified that V.F. frequently touched herself inappropriately and rubbed herself against other objects.
[13] Testimony and case review notes also indicate that R.F. was examined by Dr. Thomas Anuszkiewicz, but he did not testify.