OPINION
{¶ 1} Scott Smith, appellant, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in which the court granted the motion of Franklin County Children Services ("FCCS"), appellee, for permanent custody.
 {¶ 2} H.M.S. was born on November 22, 2003, and is the daughter of appellant and Emma McCall. Staff at the hospital at which H.M.S. was born contacted FCCS after becoming concerned about H.M.S.'s welfare due to appellant's and McCall's actions and care of H.M.S. There was testimony that the hospital workers were concerned about the parents' hygiene, their living with a registered sex offender, and their mental and cognitive abilities. FCCS filed a complaint on November 23, 2003, alleging that H.M.S. was a dependent minor child. H.M.S. was placed in foster care when she was four days old and has remained in foster care since that date.
 {¶ 3} On January 28, 2004, the trial court found H.M.S. to be a dependent child and granted temporary custody to FCCS. A case plan was developed, and there was conflicting testimony as to the parents' progress on the plan. On June 4, 2004, FCCS filed a motion seeking permanent custody of H.M.S. A trial was held on various dates in March, April, and May 2005. On May 16, 2005, the court granted FCCS's motion for permanent custody. Appellant appeals the judgment of the trial court, asserting the following assignments of error:
[I.] The trial court committed plain error in permitting counsel for Franklin County Children Services to use unproven allegations to cross examine the parents.
[II.] The trial court erred in granting the motion for permanent custody as the decision was against the manifest weight of the evidence and contrary to law.
 {¶ 4} Appellant argues in his first assignment of error that the trial court committed plain error when it permitted counsel for FCCS to use unproven allegations to cross-examine him. Specifically, appellant contends the trial court erred when it permitted FCCS's counsel to ask appellant the following questions without any evidence to support the allegations: (1) whether it was incorrect that an investigator for FCCS found the rails for a crib at the parents' home were not attached; (2) whether it was incorrect that hospital staff reported that the parents did not have supplies for the baby; and (3) whether parenting-class counselors had indicated it was unsafe for the child to reside at the parents' home. Appellant maintains that, after appellant denied the allegations, it was incumbent upon FCCS to then show a good-faith basis for the questions.
 {¶ 5} Appellant further asserts that FCCS then sought hearsay from caseworker Shannon Evans. Evans testified that an intake worker for FCCS received a call about H.M.S., and then FCCS staff went to the hospital where social workers told the FCCS staff that they were concerned about the parents' hygiene, that a registered sex offender was residing with them, and about their mental and cognitive abilities. Evans further testified that there were allegations that McCall had tried to feed H.M.S. chocolate milk and wanted to teach her to suck from her other breast when H.M.S. preferred the other one. Appellant argues that the caseworker's testimony, with regard to the information related by the caseworker, contained two layers of hearsay and none of the allegations were supported by evidence or testimony.
 {¶ 6} Appellant acknowledges that no objections to any of the above testimony were entered at trial. A party who fails to object to testimony at trial waives error on appeal relative to that testimony unless there was plain error. State v. Ballew
(1996), 76 Ohio St.3d 244, 251. In civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself. See Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, syllabus; In re McLemore,
Franklin App. No. 03AP-714, 2004-Ohio-680, at ¶ 11.
 {¶ 7} In the present case, we fail to find the trial court's failure to exclude appellant's and Evans' testimony amounted to plain error. We first note that none of the allegations contained in the questions at issue posed by FCCS's counsel to appellant were cited by the trial court in rendering its decision; thus, any prejudicial effect of permitting the questions is dubious. Notwithstanding, appellant is correct that it is improper to attempt to prove a case by insinuation or innuendo, rather than with evidence. See State v. Lowe, Franklin App. No. 04AP-1189,2005-Ohio-6614, at ¶ 9. Questions that are not based on fact or for which there is no good-faith basis are improper. Id. However, by its nature, cross-examination often involves a tentative and probing approach to testimony given on direct examination. Id., at ¶ 10, citing State v. Gillard (1988), 40 Ohio St.3d 226,231. Therefore, the examiner need not lay an evidentiary foundation before posing questions upon cross-examination. It is sufficient if there is a good-faith basis to question the witness on the subject. Id. Where the good-faith basis for a question is not challenged at the trial level, it is presumed that such a basis exists. Id., at ¶ 11; Gillard, supra, at 231 ("[s]ince the prosecutor's good-faith basis for asking these questions was never challenged, we presume she had one"). See, also, State v.Davie (1997), 80 Ohio St.3d 311, 322.
 {¶ 8} Here, the testimony elicited by FCCS's counsel from appellant was on cross-examination, and appellant's counsel never questioned whether FCCS had a good-faith basis for the questions posed. Therefore, we must presume that such a basis for the question existed. See Gillard, supra; Lowe, supra. Further, as FCCS points out with regard to the testimony of Evans on direct examination, the record contained non-hearsay evidence to support her testimony. The complaint filed on November 26, 2003, alleged H.M.S. was a dependent child, and contained allegations relating to the concerns of the hospital staff about which Evans testified. In its January 28, 2004 judgment, the trial court found the facts as alleged in the complaint were uncontested and adjudicated H.M.S. to be a dependent child. Both parties were present at the adjudicatory hearing and were represented by counsel, and neither contested any of the allegations in the complaint. Also, neither party appealed the trial court's judgment. Accordingly, the allegations in the complaint must be deemed true. Thus, FCCS's trial counsel could have used the proven allegations in the complaint as a factual basis to support his questions, and Evans' testimony would have been factually supported by the record. For these reasons, we find the trial court did not commit plain error in permitting FCCS's counsel to pose the above-referenced questions to appellant and Evans, and appellant's first assignment of error is overruled.
 {¶ 9} Appellant argues in his second assignment of error that the trial court erred in granting the motion for permanent custody because the decision was against the manifest weight of the evidence and contrary to law. A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. In reAndy-Jones, Franklin App. No. 03AP-1167, 2004-Ohio-3312. Judgments supported by some competent, credible evidence going to all essential elements of the case are not against the manifest weight of the evidence. C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279, paragraph one of the syllabus. We therefore must weigh the evidence in order to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. Reversing a judgment on manifest weight grounds should only be done in exceptional circumstances, when the evidence weighs heavily against the judgment. Id., at 387, quoting Martin.
 {¶ 10} In order to terminate parental rights, the movant must prove, by clear and convincing evidence, one of the four factors enumerated in R.C. 2151.414(B)(1) and that the child's best interest is served by a grant of permanent custody to FCCS. Inre M.B., Franklin App. No. 04AP-755, 2005-Ohio-986. Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus. It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. Id.
 {¶ 11} R.C. 2151.414(B)(1) provides that the court may grant permanent custody of a child to a movant if the court determines by clear and convincing evidence that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that one of four circumstances in the rule applies. The trial court here found subsection (B)(1)(a) applied. R.C. 2151.414(B)(1)(a) provides the court may grant permanent custody if the child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 12} In making a determination as to whether a child cannot or should not be placed with the parents, FCCS must establish one of the factors in R.C. 2151.414(E). Here, the trial court found FCCS had established R.C. 2151.414(E)(1), (E)(2), (E)(4), and (E)(16). R.C. 2151.414(E)(1) provides:
Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
R.C. 2151.414(E)(2) provides:
Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code[.]
R.C. 2151.414(E)(4) provides:
The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]
R.C. 2151.414(E)(16) provides:
Any other factor the court considers relevant.
 {¶ 13} In the present case, appellant notes in a footnote that the trial court's finding, pursuant to R.C. 2151.414(E)(2), must have been inadvertently added to the court's findings, as there was no evidence in the record to support this finding or any discussion of chronic or severe mental retardation at trial. FCCS does not address or even mention the finding under (E)(2) in its brief. Therefore, FCCS seemingly concedes the record was lacking any evidence to support such a finding.
 {¶ 14} Appellant's only argument in his brief with regard to whether the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents, pursuant to R.C. 2151.414(B)(1)(a), is the trial court's finding relating to R.C. 2151.414(E)(1). Appellant maintains there was not clear and convincing evidence the parents failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. Appellant argues that he substantially complied with many of the objectives of the case plan, and the agency prematurely moved for permanent custody prior to giving the family a fair opportunity to fully complete the case plan.
 {¶ 15} With regard to appellant's contention that the agency moved for permanent custody prematurely, appellant asserts FCCS moved for permanent custody shortly after obtaining temporary custody of the child, when she was only six months old. However, clearly there is no requirement that FCCS wait for any particular amount of time to file a motion for permanent custody after obtaining temporary custody. As this court found in In reBrooks, Franklin App. No. 03AP-282, 2003-Ohio-5348, R.C.2151.413(A) contains no requirement that the agency have temporary custody for a certain time period before moving for permanent custody. Id., at ¶ 15, citing In re Austin (Dec. 19, 2001), Allen App. No. 1-01-79, and In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA12. The only time requirements under section R.C. 2151.414(B)(1)(a), which is the section of the code under which this case was filed, are that the child not have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period, and that the child cannot or should not be placed with either of the child's parents within a reasonable time.
 {¶ 16} Insofar as appellant may be arguing that FCCS filed its motion prematurely because it did not give him and McCall a reasonable opportunity to complete the case plan, appellant contends they completed many of the objectives of the case plan in the short amount of time they had to comply. Appellant argues that they completed parenting classes and were able to discuss the information they learned in the course. He claims he learned about nutrition, home safety, hygiene, how to communicate through sign language, and how to perform CPR for infants. He says he and McCall met with a physical therapist and worked with H.M.S. to strengthen her legs. He further notes that they have never had utilities turned off and have baby clothes, a stroller, a car seat, and a booster seat. They obtained a safety gate and were in the process of replacing the baby crib. Appellant also points out that the FCCS caseworker indicated that their hygiene had improved, they had attended a majority of the medical appointments scheduled by the foster parents, and began individual counseling at Directions for Youth on March 30, 2005.
 {¶ 17} Several witnesses testified at the permanent custody hearing as to the parents' progress on the case plan and their steps toward reunification. Appellant testified that, although he missed two appointments for psychological testing, he did appear for the third appointment. However, he stated he never participated in individual counseling and did not complete a psychiatric evaluation. At the May 2005 hearing, appellant revealed he had signed up for anger management classes and individual counseling the day before the March 2005 hearing, but forgot to request a psychiatric evaluation. Appellant also stated he missed two parenting classes and numerous visitations, although he claimed he missed the visitations because he was sick. He admitted he did not know how to change H.M.S.'s diapers or her clothes, that he sometimes had to be asked to participate in H.M.S.'s care, and that he had to be reminded to watch H.M.S. He also fell asleep several times at visitations. Appellant also missed the first appointment when H.M.S.'s physical therapist came to a visitation to teach them techniques to help H.M.S. He said they finally met with the therapist and, even though he was seated behind her, he could see what she was doing.
 {¶ 18} In addition, appellant testified that, although the guardian ad litem and caseworker visited his and McCall's home the week before the hearing and found it dirty, he said he was going to keep his new residence cleaner. He said they now have a baby gate and booster seat, although they had not bought a crib yet. Appellant stated that instructors from the parenting class had concerns about the safety of his home when they visited and, although he was told to get safety covers for his outlets, he never got them. Appellant also admitted that the caseworker repeatedly told him he had body odor and was wearing soiled clothes. Appellant also testified he did not know his sister-in-law's boyfriend, with whom he and McCall lived, was a sex offender until the hospital informed him, and he does not see the boyfriend anymore. However, he later admitted that his sister-in-law and her boyfriend live in the same residential complex. He also asserted that when H.M.S. was first born, they had bottles, diapers, baby wipes, and clothes in the house for her.
 {¶ 19} McCall testified that she also missed her first two psychological evaluation appointments but went to the third one. She admitted she gave Evans a false number and name of a counselor because she wanted Evans to stop pestering her about scheduling counseling. McCall was unable to give any examples of disciplinary techniques she learned at parenting classes and could not remember whether she had used anything from the parenting classes during visitations. She admitted she missed some visitations and was late for others, but stated she missed them because she was either sick or her alarm clock malfunctioned. During visitations, McCall stated she had to be reminded to change H.M.S.'s diapers and not to leave H.M.S. on the couch by herself. She also missed the visitation the first time the physical therapist came to show her how to help H.M.S. She admitted she knew nothing about the school H.M.S. attended and had never asked anyone about it, and she was not sure what kind of food was appropriate for H.M.S. Further, McCall conceded her home was not clean one week before the trial started, despite her being told from the beginning of the case that the condition of the house was of great concern. She also stated she realized her personal hygiene had been an issue from the beginning of the case.
 {¶ 20} Shannon Evans, a caseworker for FCCS, testified that, at the time of the hearing, the parents were unable to consistently provide H.M.S. food, shelter, clothing, and proper hygiene, in contravention of the case plan. The parents once tried to feed H.M.S. potato chips from the vending machine, and McCall became very frustrated trying to feed H.M.S. her baby food. During visits to the parents' home, Evans observed pop cans, pop bottle lids, forks, dog feces, dirty clothes, cockroaches, and full ashtrays on the floor, which was ripped in places. She often warned the parents about leaving dangerous items on the floor, but their behavior never changed. The week before the hearing, besides being unsanitary, the home had no baby supplies or crib. There also appeared to be another person's clothes in the spare bedroom, and McCall told her they belonged to her sister, whose boyfriend was a registered sex offender. Evans stated that the parents' clothes were very soiled and smelled very bad during visitations, and McCall had bugs on her shirt at one visitation. Evans observed a rash on H.M.S.'s skin after coming in contact with the parents. Although there were times when their hygiene seemed to improve, they would then regress, and she had not seen consistent improvement.
 {¶ 21} In addition, Evans stated the parents have not complied with the case plan in terms of H.M.S.'s medical needs. She stated that, although the parents attended the majority of doctor visits, they were uncooperative with the doctors at times and did not ask a lot of questions. Even though the parents missed the first visitation the physical therapist attended, when the therapist came again, appellant sat behind the therapist and could not see what she was doing. McCall never could execute the physical therapy techniques on H.M.S. without prompting. However, the parents have appeared to understand some of H.M.S.'s needs.
 {¶ 22} Evans also stated the parents did not get individual or psychiatric counseling, contrary to the case plan. She testified that the parents missed the first two psychological examinations but went to the third after Evans scheduled an FCCS staff member to pick them up for the appointment. Evans testified that McCall gave her a false phone number and name of a counselor and, when Evans called the number, it was a private residence. Evans even tried to schedule the appointments for the parents herself, but the facilities required the parents to make the appointments. She also sent the parents referrals for individual counseling and psychiatric evaluations, but they never scheduled them.
 {¶ 23} Evans further stated that, although the parents went to parenting classes, they were unable to incorporate anything they learned during the visitations. They often spoke very loudly at H.M.S. when she did something wrong, instead of demonstrating the correct action. They also had to be prompted how to feed H.M.S., how to interact with H.M.S., and how to change H.M.S.'s diaper. Their reaction to her crying was always to give her a bottle and try to make her sleep. McCall also painted her nails during one visitation and brought a lot of food and visitors to the visitations instead of interacting with H.M.S. Repeatedly, Evans would have to remind McCall to do something or not do something because her behavior was not changing and it was putting H.M.S. in an unsafe situation. She stated appellant missed 39 visitations out of 71 and McCall missed 12 out of 71, and only on a few occasions did they call to say they could not attend. On several occasions, McCall had stated appellant was sick and could not come to the visitation, but he would show up an hour later and say he had been running errands. She only saw appellant attempt to change H.M.S.'s diaper once, and he did not complete the task. She opined that, without assistance, the parents would be unable to protect H.M.S. and keep her safe on an ongoing basis. She does not believe H.M.S. is bonded with her parents or that she could be placed with either in a reasonable amount of time.
 {¶ 24} Chris Heckert, the guardian ad litem, testified that, in July 2004, he witnessed a visitation between H.M.S. and the parents. The parents were happy to see H.M.S., and McCall seemed to interact fairly well with H.M.S., while appellant basically observed. He did not believe Evans did a lot of prompting to the parents as to appropriate care, but Evans later told him that the parents had been much more active in that visit than any of the others. He said he had been to the parents' residence three times — once to their old house, when the case originally opened, and twice to their more recent one. The first house was dirty, with dust, cigarette butts, and full ashtrays present on the main floor, and a cigarette lighter on the sofa. The bedrooms were cleaner, and there were baby supplies in a drawer, but their baby crib was not appropriate. The basement was "filthy," with a significant amount of dog feces on the floor. Dirty clothes were also piled on the floor. In March 2004, he made an announced visit to the parents' second residence. They had recently moved there, and the home was in fair condition. Although it was not suitable for a child, it was close. There were small amounts of litter, cigarette butts, and trash on the floor. They did not have a baby gate to keep their two dogs confined. In March 2005, he made an unannounced visit to the home again, and it was in the worst condition he had ever seen any home in as a guardian ad litem. There was actual garbage, feces, mattresses, and clothes on the floor. He saw cockroaches on the doorways and walls, and there was a significant amount of dirty dishes in the sink. The linoleum flooring had been torn up. The front panel on the VCR was also missing. He also stated that, although the parents said McCall's sister, whose boyfriend was a registered sex offender, did not live at the newest residence, her personal items were still there. He testified that the situation with the condition of the home was so drastic that, even if the parents had completed everything else in the case plan, he would say they could not parent this child.
 {¶ 25} Further, Heckert believed the individual counseling and mental health examinations for the parents were important parts of the case plan, and he thought they demonstrated, at times, a willingness to make necessary changes to obtain reunification. However, he opined they were not ever going to take the necessary steps to make the home safe for a child. He believed FCCS's motion for permanent custody should be granted.
 {¶ 26} After a review of the testimony given at the hearing on this matter, we find there was clear and convincing evidence the parents failed continuously and repeatedly to substantially remedy the conditions causing H.M.S. to be placed outside the home. Although appellant points out several factors that could be construed in the parents' favor, there was clear and convincing evidence presented that they had failed to make progress on many key parts of the parenting plan, despite significant efforts by FCCS to aid them to that end. Failure to complete significant aspects of a case plan, despite opportunities to do so, is grounds for terminating parental rights. See In re Brofford
(1992), 83 Ohio App.3d 869 (non-compliance with a case plan is a ground for termination of parental rights); In re M.L.J.,
Franklin App. No. 04AP-152, 2004-Ohio-4358 (same).
 {¶ 27} Here, appellant admitted he had missed over half of the visitations and fell asleep at others. See, e.g., In reA.W., Summit App. No. 22253, 2004-Ohio-6537, at ¶ 9-11 (failing to attend visitations undermines the goal of the case plan to develop a relationship between the parent and child, and supports a finding that the parent failed to substantially remedy the conditions that caused the child to be placed outside the home);In re T.P., Montgomery App. No. 20604, 2004-Ohio-5835, at ¶ 43 (given mother's failure to visit the children regularly, the trial court was justified in finding that they could not be returned to her within a reasonable time). Appellant also did not know how to change H.M.S.'s diaper and had limited interaction with H.M.S. during visitations. McCall admitted she did not know what kind of food was appropriate for H.M.S., knew nothing about the school H.M.S. attended, and never asked anyone about her schooling. Neither parent seemed able to incorporate anything they learned at the parenting classes into their visitations with H.M.S. See, e.g., In re Crystal S., Sandusky App. No. S-03-001,2004-Ohio-219, at ¶ 12 (that mother was not making progress on her parenting skills and did not appear able to apply or follow-up on the information she was provided supported a finding that the child could not be placed with her mother within a reasonable time or should not be placed with her).
 {¶ 28} Further, despite Evans' repeated attempts to get the parents to attend individual counseling and psychiatric evaluations, they never scheduled counseling until one day before trial, and McCall admittedly lied to Evans about the phone number and name of a counselor. See, e.g., In re Carr, Stark App. No. 2004-CA-00256, 2004-Ohio-6144 (mother did not comply with the case plan, as she failed to follow up with counseling); In reJ.L., Cuyahoga App. No. 85668, 2005-Ohio-6125, at ¶ 15 (the father had failed to comply with the case plan requirement that he receive psychological counseling); In re Phillips, Ashtabula App. No. 2005-A-0020, 2005-Ohio-3774, at ¶ 40 (mother failed to comply with case plan and substantially remedy circumstances that resulted in removal of her children by failing to address her various mental health issues via psychological counseling). Also, although appellant and McCall denied they still had contact with the boyfriend of McCall's sister, who is a registered sex offender, they were living in the same residential complex in which he lived. See, e.g., In re Malone, Crawford App. No. 3-03-25, 2004-Ohio-533, at ¶ 22 (parent's association with sex offenders supports finding that the child cannot be placed with the parent within a reasonable time or should not be placed with the parent); In re Villa (Oct. 26, 2001), Marion App. No. 9-01-21 (same).
 {¶ 29} The most glaring deficit in the parents' failure to make progress was the condition of their home. The guardian ad litem and caseworker had visited the parents' home the week before the hearing and found garbage, dog feces, mattresses, dirty clothes, dirty dishes, pop cans, pop bottle lids, forks, and full ashtrays on the floor, and saw cockroaches on the wall. The electrical components inside the VCR were also exposed. A week before the hearing, the parents' home had no baby supplies or crib, and it was in the worst condition in which the guardian ad litem had seen any residence. The guardian ad litem testified that the situation with the condition of the home was so extreme that, even if the parents had completed everything else in the case plan, appellant and McCall could not parent this child. See, e.g., In re Kuhn, Crawford App. No. 3-02-47, 2003-Ohio-2710, at ¶ 10-12 (deplorable and unsanitary condition of the parents' home supported finding that they continuously failed to substantially remedy the conditions causing the children to be placed outside the home); In re Berkley, Pickaway App. No. 04CA12,2004-Ohio-4797, at ¶ 65 (same); In re V.F., Cuyahoga App. No. 83806, 2004-Ohio-4494, at ¶ 15-17 (that house was in a "deplorable" condition, including piles of newspapers, old furniture, garbage, dirty dishes, bugs, flies, and mice, demonstrated parent's inability to remedy the conditions that caused the removal of the children).
 {¶ 30} There was also no evidence that either of the parents made any progress in improving their personal hygiene, despite knowing their personal hygiene had been an issue from the beginning of the case. The parents' clothes were soiled and smelled during visitations, and McCall had bugs on her shirt at one visitation. H.M.S. developed a rash where she had had contact with the parents. Although there were times when their hygiene seemed to improve, they would then regress, and there had been no consistent improvement. See, e.g., In re Kitana, Tuscarawas App. No. 2004-AP-03-0024, 2004-Ohio-3963, at ¶ 30 (on-going hygiene problems with the parents is a factor in determining whether children could not or should not be placed with the parents within a reasonable time); In re Kuhn, supra, at ¶ 12 (same). Given the approximately one and one-half years that elapsed during the pendency of the case, it was clear the household sanitation and hygiene issues were not temporary.
 {¶ 31} The parents failed to remedy, or even work toward improving these circumstances, despite the reasonable efforts made by FCCS to assist the parents in working toward reunification. Evans spoke to the parents about the case plan on numerous occasions. Evans also provided counseling, parenting education, and psychological evaluation referrals to the parties, and she enrolled the parents in their parenting class. Evans also personally called at least one counseling center in an attempt to get the parents individual counseling and, when she was not permitted to schedule it for them herself, she gave the information to the parents, but they never scheduled appointments. Parents have a duty to make use of the services to which the county refers them in order to rectify the problems causing the removal of the children from the home. See In reJ.L., supra, at ¶ 8. FCCS also provided appellant and McCall with bus passes, taxi rides, and personal rides from FCCS workers in order to attend their visitations and appointments. FCCS and the guardian ad litem also conducted several home visits to check for sanitation and safety, and FCCS gave the parents cleaning supplies and laundry detergent. Evans also helped the parents interact with H.M.S. during visitations, gave them suggestions as to how to handle certain situations with H.M.S., and invited the physical therapist to visitations to teach the parents how to care for H.M.S.'s special needs. Thus, the record demonstrates FCCS made substantial efforts to assist the parents in reunification.
 {¶ 32} For all of the foregoing reasons, we find there was clear and convincing evidence that the child cannot or should not be placed with the parents, as they failed continuously and repeatedly to substantially remedy the conditions causing H.M.S. to be placed outside her home. As the evidence supported a finding under R.C. 2151.414(E)(1), we need not undergo an analysis of the circumstances under (E)(4) and (E)(16).
 {¶ 33} Having found one of the factors in R.C. 2151.414(E) existed, the trial court was then required to determine whether permanent custody was in the best interest of the child pursuant to R.C. 2151.414(D). R.C. 2151.414(D) provides that, in determining the best interest of the child, the court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in divisions (E)(7) through (11) of this section apply in relation to the parents and child. The factors set forth in R.C. 2151.414(E)(7) through (11) include: (1) whether the parents have been convicted of or pled guilty to various crimes; (2) whether medical treatment or food has been withheld from the child; (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drug abuse; (4) whether the parent has abandoned the child; and (5) whether the parent has had parental rights terminated with respect to a sibling of the child.
 {¶ 34} Appellant does not contest the trial court's best interest findings. A review of the record reveals that the trial court considered all of the necessary factors. See In re C.C.,
Franklin App. No. 04AP-883, 2005-Ohio-5163, at ¶ 53 (must be apparent the trial court considered the best interest factors). The testimony presented at trial indicated that H.M.S. had bonded with her foster parents, and they were considering adopting her. Further, H.M.S.'s interaction with her own parents was unsatisfactory. Although McCall showed some attempt to provide care for H.M.S. during visitations, the evidence indicated appellant's interactions with H.M.S. during visitations were extremely limited, and he seemed to show no genuine interest in caring for her. See, e.g., In re K.H., Summit App. No. 22765,2005-Ohio-6323, at ¶ 18 (that mother's interaction with the children during visitations was "minimal" supported finding that it would be in the best interest of the children that permanent custody be granted); In re James, Franklin App. No. 03AP-373, 2003-Ohio-5208, at ¶ 22 (little interaction between the parent and child during visitations supports a finding that it would be in the best interest of the child that permanent custody be granted). The parties also failed to demonstrate concern for the child by frequently missing visitations and H.M.S.'s doctors' appointments. See, e.g., In re S.C., Lorain App. No. 04CA008469, 2004-Ohio-4570, at ¶ 36 (that the parent attended less than half of the scheduled visitations supports a finding that permanent custody is in the best interest of the child); Inre T.P., at ¶ 40-42 (attendance at only 53 percent of 125 weekly visits evidenced a lack of commitment and dedication to the children and supports the trial court's determination that termination of her parental rights is in the best interest of the children). Neither parent showed interest in learning about H.M.S.'s daily life, her schooling, or her diet. Further, although H.M.S. was unable to express her wishes, her guardian ad litem believed the granting of permanent custody was in her best interest. For these reasons, we find there was clear and convincing evidence that it was in H.M.S.'s best interest that FCCS be granted permanent custody. The trial court's decision was not against the manifest weight of the evidence or contrary to law. Therefore, appellant's second assignment of error is overruled.
 {¶ 35} Accordingly, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.
Judgment affirmed.
Sadler and Travis, JJ., concur.