[Cite as *In re R.P.*, 2021-Ohio-4065.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| R.P., Jr., | : | No. 20AP-538 |
| (R.P., | : | (C.P.C. No. 17JU-2629) |
| Appellant). | : | (REGULAR CALENDAR) |
| In re: | : | |
| L.P., | : | No. 20AP-539 |
| (R.P., | : | (C.P.C. No. 17JU-2631) |
| Appellant). | : | (REGULAR CALENDAR) |
| In re: | : | |
| W.P., | : | No. 20AP-540 |
| (R.P., | : | (C.P.C. No. 17JU-6096) |
| Appellant). | : | (REGULAR CALENDAR) |
| In re: | : | |
| W.P., | : | No. 20AP-542 |
| (S.S., | : | (C.P.C. No. 17JU-6096) |
| Appellant). | : | (REGULAR CALENDAR) |
| In re: | : | |
| R.P., Jr., | : | No. 20AP-543 |
| (S.S., | : | (C.P.C. No. 17JU-2629) |
| Appellant). | : | (REGULAR CALENDAR) |

In re:                                                    :

L.P.,                                                     :          No. 20AP-544
                                                                    (C.P.C. No. 17JU-2631)
(S.S.,                                                    :

                                                                    (REGULAR CALENDAR)
                          Appellant).                    :

_____

D E C I S I O N

Rendered on November 16, 2021

_____

**On brief:** *Steven Thomas D. Potts*, for appellee Franklin
County Children Services.

**On brief:** *Allison L. Harrison Law, LLC*, and *Todd A.
Fichtenberg*, for appellant R.P.

**On brief:** *Anzelmo Law*, and *James A. Anzelmo*, for
appellant S.S.

_____

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

KLATT, J.

{¶ 1}   Appellants, R.P. ("father") and S.S. ("mother"), appeal a judgment of the
Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch,
that granted permanent custody of the parents' children to appellee, Franklin County
Children Services ("FCCS").  For the following reasons, we affirm that judgment.

{¶ 2}   Mother and father are the parents of L.P., born August 24, 2013; W.P., born
April 24, 2015; and R.P., born June 17, 2016.  FCCS initially removed L.P. and W.P. from
their parents' custody in June 2015 because it was concerned that mother was selling the
children for $25 each.  Mother completed her case plan requirements, including parenting
classes, a drug and alcohol assessment, and an anger management course.  FCCS returned
L.P. and W.P. to mother in November 2015.

{¶ 3}   On November 29, 2016, L.P. was admitted to Nationwide Children's Hospital and diagnosed with a subdermal hematoma, a broken arm, and bruising and abrasions all over her body.  At first, mother reported that L.P. sustained these injuries while falling down a set of stairs two times in a two-day period.  Mother, however, later admitted that she and father caused the injuries.

{¶ 4}   On December 1, 2016, FCCS filed a complaint alleging that L.P. was an abused, neglected, and dependent child.  FCCS filed a second complaint alleging that R.P. was a dependent child because he resided in the same household with mother, father, and L.P.  FCCS did not file any complaint with regard to W.P. because he resided with his maternal grandmother.  A magistrate granted FCCS a temporary order of custody for L.P. and R.P. on December 5, 2016.

{¶ 5}   The trial court dismissed the December 1, 2016 complaints because dispositional hearings did not occur within 90 days of the filing of the complaints as required by R.C. 2151.35(B)(1).  FCCS refiled both complaints on February 28, 2017.  In relevant part, the complaints stated:

> The family has a history with [FCCS] dating back to 2013 with neglect substantiated in June 2015.  On November 29, 2016, [FCCS] received a referral on [L.P.]  It was reported that [L.P.] was taken to * * * Nationwide Children's Hospital [ ] with concerns for an arm and head injury.  The initial report stated that [L.P.] fell down the stairs on Friday, November 25, 2016, and was throwing up. * * * [T]hen on Saturday, November 26, 2016, [L.P.] fell down the stairs again at [a friend's] home. * * * It was reported that EMS was called to the parent's home on Monday, November 28, 2016.  It was reported by parents that EMS stated that [L.P.] was fine and parents needed to keep an eye on her. * * * It is reported that [L.P.] has bruising and abrasions and scars all over her body.  [L.P.] also has [a] subdermal hematoma and it is confirmed that both bone [sic] where [sic] broken which was consistent with her falling down the stairs.  On November 30, 2016, the intake caseworker met with mother.  Mother continuously stated that [L.P.] received her injuries because she fell down the stairs. * * * On December 1, 2016, mother admitted to the hospital staff that she and the father * * * caused the injuries to [L.P.].  Mother reported that she told [L.P.] to go to the corner and when [L.P] resisted and wouldn't stand up, father came over and placed [L.P.] in the corner.  Mother stated that father may have squeezed [L.P.]'s arm while placing her in the corner[,] leaving

> the bruise on her arm. * * * It was later learned that mother beats on [L.P.] and leaves bruises and has voiced not wanting her children. * * * After being evaluated by the agency nurse, [R.P.] is showing symptoms of being delayed in fine motor skills and language. [R.P.] was also not able to sit up until seven (7) months due to weak back muscles.

(Feb. 28, 2017 Compls.) On March 1, 2017, a magistrate again granted FCCS a temporary order of custody of L.P. and R.P.

{¶ 6} On May 4, 2017, FCCS filed a complaint alleging W.P. was a neglected and dependent child. In relevant part, the complaint stated:

> [W.P.] is currently residing with [his] maternal grandmother * * * by arrangement between mother and [the maternal grandmother]. On March 29, 2017, [a] [ ] caseworker arrived at [the maternal grandmother]'s home for an unannounced home visit. [The] [ ] caseworker observed various unknown adults sleeping on the couch and [the maternal grandmother] appeared upset that [the] caseworker came to [the] home unannounced. [The] [ ] caseworker reportedly heard someone upstairs tell [the maternal grandmother] "not to let [the] caseworker upstairs," raising concern as to what may be occurring in the home. The agency has concerns regarding [the maternal grandmother]'s ability to obtain medical care and ensure that [W.P.]'s basic and safety needs are met. [The maternal grandmother] also has a criminal history of drug related charges. * * * Mother is drug screened through American Court Services [ ] and has been negative for all substances. * * * Father is not drug screening consistently and continues to test positive for cocaine and marijuana. Parents are unemployed and do not have stable housing.

(May 4, 2017 Compl.) A magistrate granted FCCS a temporary order of custody of W.P.

{¶ 7} On May 11, 2017, a magistrate held a combined adjudicatory and dispositional hearing regarding L.P. and R.P. At that hearing, mother and father admitted to the second cause of action in L.P.'s complaint, which alleged L.P. was an abused child. FCCS then requested that the trial court dismiss the remaining causes of action. Mother and father also admitted to the sole cause of action in R.P's complaint, which alleged that R.P. was a dependent child.

{¶ 8} In a judgment dated May 16, 2017, the trial court adopted the magistrate's decision finding L.P. to be an abused child as defined in R.C. 2151.031(C), dismissing the

remaining abuse, neglect, and dependency causes of action as requested by FCCS, and committing L.P. to FCCS' temporary custody. In a second judgment, also dated May 16, 2017, the trial court adopted the magistrate's decision finding R.P. to be a dependent child as defined in R.C. 2151.04(C) and committing him to FCCS' temporary custody. Both judgments approved and adopted the same case plan, and made that case plan an order of the court.

{¶ 9} On July 24, 2017, a magistrate held a combined adjudicatory and dispositional hearing regarding W.P. At that hearing, mother and father admitted to the second cause of action in W.P.'s complaint, which alleged that W.P. was a dependent child. FCCS then requested that the trial court dismiss the neglect cause of action.

{¶ 10} In a judgment dated July 31, 2017, the trial court adopted the magistrate's decision dismissing the neglect cause of action, finding W.P. to be a dependent child as defined in R.C. 2151.04(C), and committing W.P. to FCCS' temporary custody. Additionally, the judgment approved and adopted an amended case plan, to which FCCS had added W.P.

{¶ 11} On December 4, 2017, the trial court issued judgments extending FCCS' temporary custody of L.P. and R.P. for six months. The trial court entered judgments granting a second six-month extension of temporary custody of L.P. and R.P. on June 25, 2018, and it entered a judgment granting the first six-month extension of temporary custody of W.P. on June 26, 2018. Additionally, in the three June judgments, the trial court approved and adopted an amended case plan, and made that case plan an order of the court.

{¶ 12} On October 19, 2018, FCCS moved for permanent custody of all three children. The trial court held a hearing on FCCS' motion on September 15 and 16, 2020. Mother, the foster mother, the caseworker assigned to the family, and the guardian ad litem for the children testified at that hearing.

{¶ 13} In judgments dated October 23, 2020, the trial court granted FCCS permanent custody of L.P., W.P., and R.P. The trial court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1), the children had been in FCCS' custody for 12 months out of a consecutive 22-month period and awarding FCCS permanent custody was in the children's best interests.

{¶ 14} Father now appeals the October 23, 2020 judgments, and he assigns the following errors:

> 1. The trial court's finding that FCCS's motion for permanent custody was supported by clear and convincing evidence is against the manifest weight of evidence.
>
> 2. The trial court abused its discretion by denying Appellant-Father R.P.'s motion for a continuance.

{¶ 15} Mother now appeals the same judgments, and she assigns the following errors:

> [1.] The trial court plainly erred by admitting the testimony and report of the guardian ad litem.
>
> [2.] Children services failed to establish, by clear and convincing evidence, that it should be given permanent custody of S.[S].'s children.

{¶ 16} We will begin by addressing father's second assignment of error, by which he argues that the trial court erred in failing to grant him a one-day continuance of the hearing on the permanent custody motions. We disagree.

{¶ 17} Immediately before the hearing began, father's attorney requested that the trial court continue the proceedings for one day so his client could attend. Father's attorney explained that father was not at court because there were "some maintenance issues he had to deal with at home; he couldn't leave that unattended." (Sept. 15, 2020 Tr. at 9.) FCCS opposed a continuance. However, to allow father's participation in the trial, FCCS agreed that it would not close its case at the end of the first day of the hearing, even if all other available FCCS witnesses had testified, so father could testify on the second day of the hearing. In the end, the trial court denied father's motion, stating, "Unspecified maintenance at a residence is not [a very good reason for a continuance] when you look at how long these children have been in custody and our need to start this case." *Id.* at 13. Nevertheless, the trial court agreed to accommodate father by adjourning court early if all available FCCS witnesses had testified so father could appear and give testimony on the second day of the hearing. Father did not attend the second day of the hearing.

{¶ 18} A juvenile court has broad discretion to grant or deny a continuance. *In re J.P.*, 10th Dist. No. 18AP-834, 2019-Ohio-1619, ¶ 32. In evaluating a request for a

continuance, a court considers: (1) the length of the delay requested; (2) whether the parties have requested and received other continuances; (3) the inconvenience to the parties, witnesses, opposing counsel, and the court; (4) whether the reason for the requested delay is legitimate or dilatory, purposeful, or contrived; (5) whether the movant contributed to the circumstances giving rise to the request for a continuance; and (6) any and all other relevant factors. *Id.* To obtain a continuance requested on the day of a hearing, a movant must show good cause for the continuance. Loc.R. 2 of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

{¶ 19} An appellate court will not reverse a denial of a continuance in a permanent custody case unless the juvenile court abused its discretion. *In re A.U.*, 10th Dist. No. 20AP-594, 2021-Ohio-2658, ¶ 11. In reviewing a juvenile court's decision to deny a continuance, an appellate court conducts a balancing test, weighing any potential prejudice to the movant against the juvenile court's ability to control its own docket and promptly and efficiently affect justice. *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 42.

{¶ 20} Here, while father only asked for a one-day continuance, the trial court had already continued the hearing five times. FCCS filed its motions for permanent custody on October 19, 2018. When father made his request for a sixth continuance on the September 15, 2020 hearing date, almost two years had elapsed since FCCS had moved for permanent custody of the children.

{¶ 21} R.C. 2151.414(A)(2) mandates that a hearing on a motion for permanent custody occur no later than 120 days after a children services agency files a motion for permanent custody. The juvenile court may, "for good cause shown," continue the hearing "for a reasonable period of time beyond the [120]-day deadline." *Id.* However, R.C. 2151.414(A)(2) limits that "reasonable period of time" for continuances by requiring the juvenile court to "issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than [200] days after the agency files the motion" for permanent custody. *Id.*

{¶ 22} Given the statutory deadlines, a juvenile court does not abuse its discretion in refusing to continue a hearing on a motion for permanent custody where that motion has been pending for over 200 days. *See In re A.U.* at ¶ 12; *In re J.P.* at ¶ 34; *In re K.J.*, 10th Dist. No. 17AP-457, 2018-Ohio-471, ¶ 20. Here, 695 days passed between the filing of the

motions for permanent custody and the hearing date. That lengthy delay justified denial of any additional continuance.

{¶ 23} Father claims that he had legitimate reasons for his continuance request. However, the reason he gave on the hearing date—home maintenance—did not constitute good cause for his absence. Father was supposedly repairing rotten bathroom flooring that had been a problem throughout the year mother lived in her apartment. Father did not explain why the repairs had to occur on the day he was due in court. On appeal, father offers additional reasons, but because father did not present these reasons to the trial court, we will not consider them. *See In re A.L.*, 10th Dist. No. 15AP-1040, 2016-Ohio-3189, ¶ 21 (holding that a party who fails to raise a basis for a continuance in the trial court waives the right to raise it on appeal).

{¶ 24} Given the extensive delay that had already occurred and the weakness of father's excuse for his absence, we conclude that the trial court did not abuse its discretion in denying his motion for a continuance. Accordingly, we overrule father's second assignment of error.

{¶ 25} We next turn to mother's first assignment of error, by which she argues that the trial court erred by admitting the testimony and report of the guardian ad litem. We disagree.

{¶ 26} Initially, we address mother's argument that the trial court erred in admitting into evidence the report of the guardian ad litem. In compliance with former Sup.R. 48(F)(1),[1] the guardian ad litem filed a written report with the trial court seven days before the hearing, on September 8, 2020. However, neither the parents nor FCCS moved to make the report an exhibit at the hearing. The trial court, therefore, never admitted the report into evidence. Consequently, the trial court did not err with regard to the report as alleged in mother's assignment of error.

{¶ 27} We, thus, turn to the argument that the trial court erred in admitting into evidence the guardian ad litem's testimony. Mother contends that the guardian spent inadequate time interviewing and interacting with the children, interviewing her, and

---

[1] The Supreme Court of Ohio recently amended the Rules of Superintendence governing guardians ad litem. The new rules, now found at Sup.R. 48 through 48.07, became effective on January 1, 2021. Sup.R. 99(RRR). As the former rules were in effect during the pendency of the trial court proceedings, we cite to and apply those rules throughout this decision.

observing her with the children.   According to mother, the trial court should have disregarded the guardian ad litem's testimony once the deficiencies in his performance became apparent.

{¶ 28}  Mother did not object to the guardian ad litem's testimony in the trial court, so we limit our review to whether the trial court committed plain error in allowing the guardian to testify.  *See In re H.M.S.*, 10th Dist. No. 05AP-613, 2006-Ohio-701, ¶ 6 ("A party who fails to object to testimony at trial waives error on appeal relative to that testimony unless there was plain error.").  To constitute plain error, the error must be obvious on the record and so fundamental that it should have been apparent to the trial court without objection.  *In re W.W.E.*, 10th Dist. No. 15AP-167, 2016-Ohio-4552, ¶ 80.  In civil cases, "the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error * * * seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."  *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.  Because appellate courts accord wide latitude to a trial court's consideration of the evidence when determining parental rights, plain error is particularly difficult to establish in cases where parental rights are at issue.  *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, at ¶ 76.

{¶ 29}  A juvenile court must appoint a guardian ad litem to protect the interest of a child in any proceeding for permanent custody held pursuant to R.C. 2151.414.  R.C. 2151.281(B).  The guardian ad litem must "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child" by a children services agency that has custody of the child, "and shall file any motions and other court papers that are in the best interest of the child." R.C. 2151.281(I).  If the guardian ad litem "fail[s] to faithfully discharge the guardian ad litem's duties," the court must discharge the guardian ad litem and appoint another guardian ad litem.  R.C. 2151.281(D).

{¶ 30}  Here, mother does not contend that the trial court erred in failing to discharge the guardian ad litem under R.C. 2151.281(D).  Rather, she argues that the trial court should have excluded the guardian ad litem's testimony because the guardian did not meet the minimum performance requirements for guardians ad litem.  At the time of trial

court proceedings, former Sup.R. 48(D) specifically delineated those performance requirements. In relevant part, former Sup.R. 48(D) stated:

> In order to provide the court with relevant information and an informed recommendation regarding the child's best interest, a guardian ad litem shall perform, at a minimum, the following responsibilities stated in this division, unless impracticable or inadvisable to do so:
>
> * * *
>
> (13) A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:
>
> (a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;
>
> (b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;
>
> (c) Ascertain the wishes of the child;
>
> (d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;
>
> (e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;
>
> (f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;
>
> (g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

{¶ 31} The Rules of Superintendence are internal housekeeping rules that create no substantive individual rights. *In re D.E.* at ¶ 77; *In re S.S.*, 10th Dist. No. 17AP-681, 2018-Ohio-1249, ¶ 11. Because Sup.R. 48 is a general guideline that lacks the force of statutory law, noncompliance with Sup.R. 48(D) is not grounds for the automatic exclusion of a guardian ad litem's report, testimony, or recommendation. *In re K.W.*, 4th Dist. No. 17CA7, 2018-Ohio-1933, ¶ 100. Rather, the trial court may exercise its discretion to consider that evidence. *In re N.B.*, 8th Dist. No. 105028, 2017-Ohio-1376, ¶ 26; *In re D.S.*, 5th Dist. No. 15 CA 30, 2016-Ohio-79, ¶ 42; *Corey v. Corey*, 2d Dist. No. 2013-CA-73, 2014-Ohio-3258, ¶ 9. As the trier of fact, the trial court may take into account any deficiencies in the guardian ad litem's performance when assigning weight to the guardian's testimony and opinions. *See In re K.W.* at ¶ 102 ("The trial court, as the fact-finder, is permitted to assign weight to the guardian ad litem's testimony and recommendation and could choose to believe or disbelieve it."); *In re T.C.*, 6th Dist. No. L-15-1106, 2015-Ohio-3665, ¶ 23 ("[T]he trial court, as trier of fact, is permitted to assign weight to the guardian ad litem's testimony and recommendation and to consider it in the context of all the evidence before the court.").

{¶ 32} Here, the trial court appointed the guardian ad litem, Guylynn Cook, after allowing the previous guardian to withdraw. Cook received his appointment on June 9, 2020, only three months before the hearing on the motion for permanent custody. At the hearing, Cook testified that upon his appointment, he reviewed the case dockets and read the complaints, the prior guardian ad litems' reports, the semi-annual administrative reviews, and mother's psychological assessment. Cook also attempted to contact mother by telephone, but her telephone was disconnected. On September 8, 2020, Cook visited the foster home, spoke with the foster parents, and interviewed the children. The next day, Cook observed the final ten minutes of a visit between mother and the children. Father did

not attend that visit. Cook then drove mother to her apartment, where he met and spoke with father and viewed the apartment.

{¶ 33} Mother criticizes the guardian ad litem for spending too little time interviewing and interacting with the children, interviewing her, and observing her with the children. As the guardian ad litem recognized, his investigation would have benefited from further meetings and discussions with the children and viewing more visits between mother and the children. Despite the shortcomings in the guardian ad litem's investigation, the trial court admitted and considered the guardian's testimony. The trial court did not abuse its discretion, much less plainly err, in so doing. The trial court could factor into its consideration the extent of the guardian ad litem's field work when weighing the guardian's testimony and opinion.

{¶ 34} Mother urges this court to follow *Nolan v. Nolan*, 4th Dist. No. 11CA3444, 2012-Ohio-3736. In that case, the Fourth District Court of Appeals concluded that the trial court abused its discretion in considering a guardian ad litem's testimony and report. *Id.* at ¶ 26. However, the lapses of the guardian ad litem in *Nolan*, which included the failure to interview a man the child would be living with, exceeded any omissions made by guardian ad litem in this case. Additionally, the Fourth District explicitly limited its decision in *Nolan* to the "specific facts of [the] case" and stated that it did "not intend to create a bright-line rule regarding the minimum standards of Sup.R. 48(D)(13)." *Id.* at ¶ 27. Because of that restrictive language, courts have refused to give *Nolan* precedential value. *In re K.W.* at ¶ 104; *In re S.S.*, 10th Dist. No. 17AP-681, 2018-Ohio-1249, at ¶ 12; *Miller v. Miller*, 4th Dist. No. 14CA6, 2014-Ohio-5127, ¶ 21. We, accordingly, do not follow *Nolan* in this case.

{¶ 35} In sum, we conclude that the trial court did not err as alleged in mother's first assignment of error. We thus overrule that assignment of error.

{¶ 36} Father's first and mother's second assignments of error challenge the trial court's decision to grant FCCS permanent custody of L.P., W.P., and R.P. An appellate court will not reverse a juvenile court's determination in a permanent custody case unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the

other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). Thus, in reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Id.* at ¶ 20.

{¶ 37} Additionally, in conducting a manifest weight review, an appellate court must make every reasonable presumption in favor of the trial court's judgment and findings of fact. *Id.* at ¶ 21. If the evidence is susceptible to more than one construction, an appellate court must interpret it in the manner most consistent with the judgment. *Id.* Moreover, " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " *In re H.H.*, 10th Dist. No. 19AP-158, 2019-Ohio-4953, ¶ 49, quoting *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34.

{¶ 38} A juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency * * * and that any of the following apply":

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 39} Once the juvenile court decides that one of the circumstances in R.C. 2151.414(B)(1) applies, the court turns to R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest. Pursuant to R.C. 2151.414(D)(1), in determining a child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following":

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 40} Here, the trial court found that the children met the criteria of R.C. 2151.414(B)(1)(d), as they had been in FCCS' temporary custody for 12 months of a consecutive 22-month period when FCCS moved for permanent custody. After consideration of the R.C. 2151.414(D)(1) factors, the trial court concluded that granting FCCS permanent custody of L.P., W.P., and R.P. was in the children's best interests. On appeal, the parents do not contest the finding that the children had been in FCCS' custody

for 12 out of 22 months. Rather, the parents only argue that the trial court erred in concluding that it was in the children's best interest to grant FCCS permanent custody.

{¶ 41} Under the first best-interest factor, the trial court must consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). In its decision, the trial court considered the parents' interaction with the children during their scheduled weekly visits. The FCCS caseworker testified that mother regularly attended visits with the children. Father, however, "d[id]n't visit much at all," missing up to two months of visits at a time. (Sept. 15, 2020 Tr. at 100.) At visits, mother would usually allow L.P. to play on mother's phone and the younger two children would "run around [and] do their own thing." *Id.* at 102. The caseworker opined that L.P. was very bonded with mother. While W.P. "knows mom," he would get upset with mother for punishing him based on L.P.'s tales of his supposed misdeeds. *Id.* at 103. R.P. would tell mother he loved her, but he was always ready to end the visit when the foster parents arrived. With regard to father, the FCCS caseworker testified that L.P. was "kind of bonded with" father, W.P. did not "go to[o] close [to] dad much," and R.P. was not "very bonded with" father. *Id.* at 104.

{¶ 42} The trial court also recounted three incidents instigated by father that occurred during visits. In the first, father slammed W.P. onto a plastic couch because W.P. had run from him and told him "no." When the FCCS caseworker told father that his actions were not appropriate, father replied that W.P. was his son and he could do what he wanted with W.P. In the second incident, father was playfully hitting the children with a bag of popcorn while attending a visit at the library. A security guard asked father to stop. Father became very angry and started yelling at the security guard. Mother joined in. The situation escalated to the point that the library banned both mother and father from returning. In the final incident, father picked R.P. up and tried to put him in a garbage can. R.P. was scared and told his father to put him down, but father ignored him. The FCCS caseworker had to step in and force father to stop.

{¶ 43} According to the foster mother, when L.P. arrived at the foster parents' home in December 2016, L.P. was very angry, and she would scream, cry, kick, and hit. At the same time, L.P. was fearful of other people, especially men, and would only trust the foster

mother. W.P. also was fearful and aggressive when he first joined the foster family. L.P. and W.P. receive both behavioral health therapy and play therapy once a week.

{¶ 44} In-person visits with mother and father were suspended for approximately three months due to COVID-19. When in-person visits resumed, the children reacted badly. L.P. began having more explosive temper tantrums, taking other peoples' belongings, and wetting the bed. W.P. started have nightly nightmares and became more aggressive with other children. R.P. began scratching his face and hitting his head.

{¶ 45} Father contends that the evidence does not establish that the resumption of in-person visits caused the children's negative behaviors. We disagree. The foster mother testified that these behaviors began on the very day of the first in-person visit, June 18, 2020. Also, logically, L.P. and W.P. might associate their parents with a period in their lives where they felt unsafe and frightened, thus resulting in them acting out upon seeing their parents after an absence.

{¶ 46} Finally, the trial court also considered the children's relationship with their foster parents. The guardian ad litem described the children's relationship with their foster parents as very loving. The foster parents maintain a regular routine for the children, including time for school, play, sleep, food, and family activities. The foster parents are interested in adopting all three children.

{¶ 47} Father criticizes the foster parents because they do not bathe the children daily. However, as the foster mother explained, the children "have very sensitive skin so we've found that it's better for us to wipe them down and not necessarily full-on bathe them each day." (Sept. 15, 2020 Tr. at 190-91.)

{¶ 48} Under the second best-interest factor, the trial court must consider "the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). This section "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 55. Here, as neither parent requested an in-camera interview of the children, the trial court looked to the guardian ad litem to determine the wishes of the children.

{¶ 49} The guardian ad litem testified that the children were too immature to understand the concepts of permanency or adoption. When the guardian spoke with the

children, he asked L.P. and W.P. how many mommies and daddies they had "to get a better understanding as to what they underst[oo]d." (Sept. 15, 2020 Tr. at 214.) L.P. said she had two mommies and two daddies, referring to both her biological and foster parents. W.P. said he only had one mommy and one daddy: his foster parents. The guardian ad litem also asked the children how they felt about their foster home and both L.P. and W.P. said that they wanted to stay in the foster home. While the guardian ad litem believed "that's what they wanted," he also believed "they really d[i]dn't understand the ramifications of that." *Id.* at 228. In other words, due to the children's immaturity, their expressed preference to live with the foster parents did not amount to a wish for permanent placements with the foster parents. R.P. was too young to make any answer to the guardian ad litem's questions.

{¶ 50} Father complains that the guardian ad litem's testimony that L.P. and W.P. wanted to stay in their foster home conflicts with his testimony that L.P. and W.P. were too immature to express their wishes. A conflict exists, however, only if L.P.'s and W.P.'s desire to live with their foster parents is interpretated as their wishes as to permanent placement. As we explained above, however, that is an incorrect interpretation because neither L.P. nor W.P. understand permanency.

{¶ 51} Father also attacks the guardian ad litem for not adequately interviewing L.P. During the hearing, father's attorney asked the guardian ad litem, "Did you follow up and * * * ask [L.P.] if she wanted to live with mom or dad * * *?" *Id.* at 229. The guardian ad litem answered, "I was not able to go that far with this particular case." *Id.* Father assumes from the guardian ad litem's answer that a lack of sufficient time with the children prevented the guardian from determining the children's wishes as to permanent placement. The evidence, however, is that the children's immaturity—not any deficiency on the guardian ad litem's part—precluded the children from expressing their wishes. The guardian ad litem "was not able to go that far" because the children lacked the capacity to understand permanency. Consequently, the trial court did not err in relying on the guardian ad litem's testimony in considering the R.C. 2151.414(D)(1)(b) factor.

{¶ 52} Under the third best-interest factor, the trial court must consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve

or more months of a consecutive twenty-two-month period." R.C. 2151.414(D)(1)(c). The trial court found that FCCS had temporary custody of L.P. and R.P. since December 5, 2016. FCCS had temporary custody of W.P. since May 11, 2017. FCCS moved for permanent custody of the children on October 19, 2018. At that time, all three children had been in FCCS' temporary custody for more than 12 months of a consecutive 22-month period. Neither parent contests the trial court's findings under the R.C. 2151.414(D)(1)(c) factor on appeal.

{¶ 53} Under the fourth best-interest factor, the trial court must consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). In considering this factor, the trial court examined whether mother and/or father could provide a legally secure permanent placement for the children. The trial court first looked to whether the parents had acquired housing that was safe and appropriate for the children.

{¶ 54} Father points to the apartment mother had obtained as evidence of parents' ability to provide housing for the children. However, father's position in that apartment is not secure. Mother initially testified that she had kicked father out of the apartment two weeks prior to the hearing because he was "not willing to help [her] get the kids back." (Sept. 15, 2020 Tr. at 32.) Later in her testimony, mother indicated that father was still living with her, but he would have to go if she received custody of the children and he was "not willing to step up and do anything for [his] kids." (Sept. 16, 2020 Tr. at 221-22.)

{¶ 55} Moreover, the trial court determined that the apartment was neither safe nor appropriate for the children. The apartment had only one bedroom and one bathroom, which the trial court deemed too small for the parents and three children. Because a prior tenant's cats had ruined the flooring, mother had removed the flooring in all the rooms so only the raw plywood subfloor remained. Father had begun replacing the bathroom flooring, but the other floors stayed bare. According to the FCCS caseworker and the guardian ad litem, the apartment was dirty and disorganized, and dog feces littered the floor. A dog urinated on the floor in front of the caseworker while the caseworker was viewing the apartment. Although the apartment had working utilities, the refrigerator had

stopped functioning a month before the hearing. Additionally, the outside door to the apartment lacked a lock.

{¶ 56} The trial court also examined evidence of the parents' income. Father told the FCCS caseworker that he worked in construction, but he explained that he was paid in cash and could offer no proof of his employment or income. Mother is not employed, but she receives monthly Social Security disability benefits in the amount of $783 and monthly SNAP benefits in the amount of $220.[2] After calculating mother's monthly expenses, the trial court determined that mother's income is barely enough for her own expenses.

{¶ 57} Finally, the trial court considered the parents' efforts to complete the case plan objectives related to their parenting skills, mental health, and substance abuse. Both parents completed parenting classes. Mother underwent a psychological assessment, but she did not follow up with the recommended drug and alcohol assessment. Father did not undergo either a psychological or drug and alcohol assessment. Neither parent attended or completed anger management classes.

{¶ 58} Both parents had to complete random drug screens. The amended case plan warned the parents that any missed screens would be considered positive. Mother missed 342 of 367 screens. She did not screen at all in 2018, 2019, or 2020. Father missed 246 of 254 screens.

{¶ 59} As mother points out, she is taking medication for her mental health conditions, which include bipolar disorder, depression, and anxiety. However, in the final judgment, the trial court stated:

> Mother's demeanor as a witness and at counsel table during trial makes clear that her mental health issues are unresolved and in need of further treatment. She left the courtroom angrily three times during the trial after hearing testimony that upset[ ] her. She became angry when questioned about how she would get the children to their medical appointments. The second day of trial the court observed her plugged into some electronics with earphones[,] pushing buttons and typing, not listening to the activities of the courtroom. She also closed her eyes and appeared to be sleeping or resting, not participating with her counsel.

(Oct. 23, 2020 Decision & Jgmt. Entry at 19.)

---

[2] SNAP is the Supplemental Nutritional Assistance Program.

{¶ 60} Based on the foregoing evidence, the trial court concluded that it could not safely return the children to either parent, and consequently, it could not achieve a legally secure permanent placement for the children without a grant of permanent custody to FCCS.  The manifest weight of the evidence supports this conclusion.

{¶ 61} Under the fifth best-interest factor, the trial court must consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."  R.C. 2151.414(D)(1)(e).  The trial court found R.C. 2151.414(E)(11) applied to father.  That factor applies if:

> [t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to [R.C. 2151.414, 2151.353, or 2151.415] * * *, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(11).  Father has lost custody of three other children, including one child that was permanently committed to FCCS' custody.  Father does not contest the trial court's conclusion that R.C. 2151.414(E)(11) applies to him.

{¶ 62} Upon review of all the best-interest factors, the trial court found that granting permanent custody to FCCS was in the children's best interests.  Although mother and father love their children, neither has fully addressed the problems, particularly the anger management issues, that resulted in the removal of the children.  Neither parent has the ability or resources to adequately care for the children.  Accordingly, after consideration of the totality of the evidence, we find that the manifest weight of the evidence supports the trial court's best-interest finding.  We thus overrule father's first assignment of error and mother's second assignment of error.

{¶ 63} For the foregoing reasons, we overrule mother's two assignments of error, we overrule father's two assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN, P.J., and MENTEL, J., concur.