[Cite as *In re K.C.*, 2024-Ohio-2081.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the matter of: K.C.,                    :

[H.E.,                                     :               No. 23AP-489
                                                        (C.P.C No. 21JU-4383)
            Appellant].                    :

                                           :               (REGULAR CALENDAR)

                                           :

─────────────────────────────────

D E C I S I O N

Rendered on May 30, 2024

─────────────────────────────────

**On brief:** *William T. Cramer*, for appellant.

**On brief:** *Jessica M. Ismond*, for appellee Franklin County
Children Services.

─────────────────────────────────

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BOGGS, J.

{¶ 1} Appellant, H.E., appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting appellee, Franklin County Children Services ("FCCS"), permanent custody of appellant's daughter, K.C. For the following reasons, we affirm the juvenile court's judgment.

## I. PROCEDURAL BACKGROUND

{¶ 2} K.C. was born on August 5, 2020, when appellant was 17 years old. FCCS filed its first complaint alleging that K.C. was an abused, neglected, and/or dependent child in October 2020, when K.C. was eight weeks old, in case No. 20JU-7319. On October 5 and 6, 2020 respectively, FCCS obtained an emergency care order and then a temporary order of custody ("TOC") of K.C., who has remained in FCCS custody and in the same foster home ever since.

{¶ 3} FCCS has filed a total of four complaints (in case Nos. 20JU-7319, 20JU-9588, 21JU-2756, and 21JU-4383) alleging that K.C. is an abused, neglected, and/or

dependent child. As each complaint was dismissed by operation of law, FCCS filed a new complaint, each time receiving a TOC.

{¶ 4} The complaint in the case now on appeal alleged that eight-week-old K.C. was transported to Nationwide Children's Hospital via ambulance on October 3, 2020, with multiple grade-two liver lacerations and a hematoma to her head, allegedly due to a fall. The complaint, which names A.C. as K.C.'s alleged father, states that appellant and A.C. provided different explanations of what happened. While A.C. reported that K.C. had fallen out of her car seat/stroller when it rolled down his porch steps, appellant reported that she had dropped K.C. The complaint noted concerns of domestic violence, as A.C. had been arrested the previous month on charges of domestic violence/assault against appellant. Appellant was reportedly living with A.C., despite a stay away order that had been issued due to the pending domestic violence charge. The complaint acknowledged appellant's prior involvement with FCCS "for unruly/delinquent behaviors and history of AWOLing." (May 3, 2021 Compl. at 2.) It also noted that a prior court ordered protective supervision of appellant had expired in September 2020.

{¶ 5} On July 12, 2021, the juvenile court magistrate issued a decision adjudicating K.C. a neglected child, making K.C. a ward of the court, committing K.C. temporarily to the custody of FCCS, and adopting a case plan for appellant and A.C. The case plan required appellant to complete a mental health assessment, attend domestic violence counseling, attend parenting classes, obtain a legal source of income, obtain and keep safe, stable housing, and maintain contact with FCCS, including engaging in face-to-face contact with FCCS at least once a month. The juvenile court judge adopted the magistrate's decision on July 26, 2021. FCCS subsequently removed A.C. from the case, after DNA testing revealed that he is not K.C.'s biological father.[1]

{¶ 6} FCCS filed a motion for permanent custody of K.C. on February 15, 2022. A trial was held on January 24, 2023 and May 30, 2023. On January 24, the court heard testimony from appellant and FCCS caseworker Carrie Miller. On May 30, the court heard testimony from appellant, Miller, and Tiffany Hatem, K.C.'s guardian ad litem ("GAL").

---

[1] No one else has been identified as a putative father for K.C.

## II. FACTUAL BACKGROUND

{¶ 7} On the first day of trial, FCCS called appellant as if on cross-examination. Appellant testified about the circumstances that led to K.C.'s removal in October 2020. Appellant admitted that she lied to investigators about the circumstances of the fall that led to K.C.'s hospitalization. She claimed she was afraid if she told the truth, K.C. would be taken away from her. At trial, appellant claimed that she had dropped K.C. off with A.C., with whom she was in a relationship, and had gone to her uncle's house. While there, she received a phone call that K.C. had fallen off the back porch, out of her stroller and car seat.

{¶ 8} Appellant was aware of her case plan with FCCS and understood that it constituted a court order. She understood the case plan required her to obtain stable housing, continue visitation with K.C., provide proof of income, and participate in mental health and domestic violence counseling to reunify with K.C.

{¶ 9} Appellant testified that she has had three different residences since FCCS removed K.C. When K.C. was removed, appellant was living with A.C. She then moved in with a friend, "Alonzo," whose last name she did not know. Appellant testified that, approximately seven months before trial, she moved into her mother's house, where she would stay with her mother, sister, and grandmother during the week, and would then stay with a friend on the weekends. Appellant did not have her own room at her mother's home and did not pay rent. Appellant continued to use A.C.'s address for her mail, because her mother did not want to receive appellant's mail. Appellant testified that her relationship with A.C. had ended over a year before trial.

{¶ 10} During her testimony on the first day of trial, appellant claimed she had found a two-bedroom apartment on East Fifth Avenue that she would begin renting that Friday, but she could not recall the apartment's address or the landlord's name. She claimed the apartment would be leased solely in her name, that she would be living there alone, and that her rent, including utilities, would be $875 per month.

{¶ 11} With respect to her income, appellant testified she had been working at Wendy's—for more than 40 hours a week—for about 8 months and that her monthly wages averaged between $1,100 and $1,200.

{¶ 12} Appellant was generally scheduled for weekly visitation with K.C., but she admitted to having missed more than half of her scheduled visits. As of the January 24,

2023 trial date, appellant had not visited with K.C. since November 2022. Appellant acknowledged that K.C. is very attached to her foster parents and that it would be difficult for K.C. to leave the foster home. Appellant stated that she would like to restart visitation so K.C. can "remember who I am and regain * * * trust * * * [a]nd regain that bond with her." (Jan. 24, 2023 Tr. at 48.)

{¶ 13} From October 2020 through mid-2022, appellant did not engage in any mental health or domestic violence services. Appellant admitted she had previously filed a petition for a civil protection order against A.C. in February 2021, alleging domestic violence, and that she had made allegations of domestic violence by A.C. in September 2020 directly to the police. She claimed at trial, however, that she had been lying when she made those allegations and that there had never been any domestic violence between A.C. and herself. Appellant stated she had declined to participate in domestic violence services because she had not experienced domestic violence. Appellant did, however, testify that she asked her individual mental health counselor, whom she began seeing in mid-2022, about domestic violence counseling, but because she continued to deny that she had been the victim of domestic violence her counselor told her there was no need to continue down that road. Appellant testified that she generally attended counseling sessions weekly, but that she missed some weeks. Appellant did not think she needed mental health counseling.

{¶ 14} FCCS's next witness was caseworker Miller, who had been assigned to K.C.'s case on July 13, 2022. Miller reviewed the case history, activity logs, case plan objectives, and visitation records. She testified that appellant's case plan required her to complete a mental health assessment and follow through with recommendations, provide a legal source of income, obtain safe and stable housing, maintain face-to-face contact with her caseworker at least once a month, and undergo domestic violence counseling. Miller first met with appellant on July 26, 2022, and then met with her once a month through November 2022 to discuss case plan objectives and her progress in meeting those objectives. Miller did not meet with appellant in December 2022, because appellant cancelled or did not show up for several scheduled meetings.

{¶ 15} Appellant had completed a mental health assessment prior to her first meeting with Miller, and Miller helped appellant get linked with a counselor at Ohio Guidestone in August 2022. For a period thereafter, appellant maintained weekly contact

with her counselor. Although appellant's counselor was qualified to provide domestic violence counseling, he was unable to do so with appellant, because she denied having experienced domestic violence. Based on concerns that appellant was disengaged during counseling and not making progress after several months, the counselor discontinued the sessions. Appellant's counselor retired in December 2022, and as of the first day of trial, FCCS had not linked appellant with a new counselor.

{¶ 16} When FCCS became involved with K.C.'s case, appellant—herself a minor— already had a history of unstable housing, as her mother had kicked her out of the family home. According to Miller, appellant was homeless when FCCS received the case, but she acknowledged that appellant had never reported living on the street or in a homeless shelter. When K.C. was removed, appellant was living with A.C. Based on FCCS records, Miller stated, appellant "would be at [A.C.]'s and then she would be at her mother's, and then she would take off for a few days." (Jan. 24, 2023 Tr. at 77.) She stated, "there were concerns when we had even received this case that [appellant] had had a history of living on the streets even as a teenager" and "a long history" with appellant's mother "for neglect" of appellant. *Id.* at 58. FCCS was also aware of sexual abuse allegations involving appellant when she was a teenager and had concerns that appellant had been a victim of human trafficking. When confronted with those allegations, appellant reported that she was a prostitute and declined services.

{¶ 17} Miller provided appellant with a housing list and a list of landlords in the area in which appellant was looking for housing. Miller stated that previous caseworkers had provided appellant with direct housing applications. Appellant was also "provided resources for Choices Domestic Violence Shelter multiple times," as recently as February 2022, but she did not follow through. *Id.* at 110.

{¶ 18} On the first day of trial, Miller testified that she had never visited with appellant at a home she deemed stable and safe. At one point, after appellant informed Miller she was living with her mother, D.S., Miller went to observe the home, but D.S. reported she was the only person residing there. Miller observed that the home had one bedroom and the belongings of one person. When confronted, appellant stated that she did not actually reside there, but was instead residing with a friend. Appellant was unable or

unwilling to provide Miller with that friend's last name, address, or contact information, however.

{¶ 19} Miller testified that if appellant were to obtain the apartment she had testified about, Miller would evaluate appellant's living situation. Miller was scheduled to meet with appellant at the library the Friday after the first day of trial, but she stated, "[i]f she has a key and we're able to meet at the house that would be an option." (Jan. 24, 2023 Tr. at 86.) To satisfy FCCS, Miller stated the residence "would need to be a safe and stable environment with safe people and no criminal behavior taking place at that home," and appellant would need to have been living there for a period of time. *Id.* at 60. Miller testified that FCCS can provide pack-n-plays and supplies to parents in need of them and that, if K.C. were returned to appellant, FCCS would likely make a referral to a furniture bank to assist with furnishing the home.

{¶ 20} Miller next testified about appellant's visitation history with K.C. Prior to Miller taking over as caseworker in July 2022, appellant's visitation had twice been suspended after she missed or cancelled three visits. Excluding those periods, appellant had missed 25 visits. Miller supervised a visit between appellant and K.C. on K.C.'s birthday, August 5, 2022. Appellant brought a birthday cake and gifts for K.C., and Miller observed K.C. was sitting on appellant's lap, and they were interacting with one another. Appellant expressed frustration over a requirement that she arrive 45 minutes early for visits because of her history of tardiness and no-shows, and Miller told her she would cancel the 45-minute rule if appellant showed up on time for three visits, but appellant did not do so. Appellant's visits were suspended for about six weeks in the fall of 2022.

{¶ 21} Miller next supervised appellant's last visitation with K.C. prior to trial, on November 10, 2022. The interaction between appellant and K.C. at that visitation, Miller stated, was markedly different from what she had observed in August. When K.C. got overwhelmed and began to cry, she put her arms up and walked past appellant to seek comfort from Miller. Then Miller testified, for the first 15 minutes of the visit, K.C. and appellant did not interact or speak with each other. In light of the November 2022 visitation, Miller believed that K.C. and appellant are not bonded.

{¶ 22} Appellant informed Miller at the November visitation of a transportation barrier to attending visitation, so Miller provided her with a bus pass for the month of

November, but appellant did not use it for any case plan objectives. After appellant missed visits in November and December 2022, visitation was again suspended. Because Miller had not met face-to-face with appellant in December 2022 or prior to trial in January 2023, visitation had not been reinstated, but Miller stated she could meet with appellant when court recessed to reinstate visitation.

{¶ 23} Miller also observed K.C. in her foster home and concluded that K.C. and her foster parents are bonded. She explained that the foster parents are loving and that they play and talk with K.C. about what she does every day. They have enrolled K.C. in baby gymnastics, swim lessons, and day care. The foster parents are interested in adopting K.C. and have also expressed a willingness to allow an ongoing relationship between K.C. and appellant, if safe to do so, should they adopt K.C.

{¶ 24} Miller acknowledged that appellant had satisfactorily completed her case plan objective of obtaining a legal source of income, as she was employed at Wendy's on the first day of trial.

{¶ 25} According to Miller, FCCS would continue to work with appellant towards reunification, which is "always the goal until it's no longer an option." (Jan. 24, 2023 Tr. at 88.) She testified that FCCS could assist appellant by linking her with another counselor, providing bus passes if transportation remained a barrier, and providing a referral to a furniture bank if appellant obtained the apartment she had testified about. But she also noted that K.C., who has been in FCCS custody for two and one half years, deserves permanency.

{¶ 26} During the first day of trial, the juvenile court judge encouraged appellant to take actions to rectify her shortcomings with respect to her case plan before the trial reconvened:

> [W]e're not [going to] finish today. * * * And there will be a time -- a period of time for some of these things to be rectified. But I'm [going to] need to see efforts to rectify or else we're [going to] continue trial and we're [going to] be right on the same place that we were before. * * * You're probably [going to] have at least three months to try to improve your situation for trial but it's [going to] require effort on your time -- on your place. * * * And you need to focus on what you can do in this interim period of time to at least show that you're trying.

(Jan. 24, 2023 Tr. at 64-65.) Again, before recessing for the day, the judge encouraged appellant to be "truthful at all times, even if you think it's bad news," to consistently avail herself of visitation with K.C., to stop denying that she is a victim of domestic violence, and to engage in domestic violence counseling. *Id.* at 117.

{¶ 27} When appellant retook the witness stand on the second day of trial, on May 30, 2023, she had given birth to another child in the intervening four months. The baby, A.C., Jr., was in FCCS custody, and had been placed with the same foster parents as K.C. Appellant had not disclosed her pregnancy to either FCCS or the GAL prior to giving birth on April 12, 2023. Despite appellant's testimony in January 2023 that her relationship with A.C. had ended a year earlier, A.C. is the baby's father.

{¶ 28} Other than claiming to have scheduled an appointment to begin domestic violence counseling in June,[2] appellant had not engaged in any services since January 2023. Appellant had been contacted to begin domestic violence counseling a month or two prior to the second days of trial, but she declined services because she wanted a female counselor. Contrary to her prior testimony, appellant admitted at the second day of trial that A.C. had previously assaulted her, four years prior, and that she was a victim of domestic violence, but she was no longer worried about domestic violence because A.C. "has changed over time." (May 30, 2023 Tr. at 15.) Nevertheless, she conceded that, following the birth of A.C., Jr., hospital staff put her and A.C. on different visitation schedules so they would not be at the hospital at the same time, because they were "not seeing eye to eye." *Id.*

{¶ 29} As an update to her housing situation, appellant provided her current home address, which she believed she moved into in March 2023. According to appellant, both her name and A.C.'s name are on the lease, although she denied she was living with or in a relationship with A.C. Appellant tried to conceal that A.C.'s name was on the lease by scratching his name out on the copy of the lease she provided to her caseworker, because she believed the caseworker would have had "a problem with it." *Id.* at 20. Appellant did not understand why FCCS would have a problem with her living with A.C. or with having his name on her lease. She stated his name is on the lease "[b]ecause he helped me get the

---

[2] Appellant could not identify the supposed provider, did not know where the provider was located, had not completed intake paperwork, did not know how frequently she would be attending counseling, and did know the name of the counselor she would be seeing. She had not told her caseworker about the supposed appointment.

house." *Id.* at 26. Appellant stated she needed someone to cosign or to be listed on the lease because she had never had an apartment or home in her individual name.

**{¶ 30}** Appellant had also started a new job, at a different Wendy's location, the day before the second day of trial. The new job was part-time, with "up to 40" hours per week. *Id.* at 31. Appellant had left her job at the prior Wendy's location because "the staff there was too much, very rude." *Id.* at 35.

**{¶ 31}** The next witness on the second day of trial was Hatem, K.C.'s GAL. Hatem testified that, when she was appointed in October 2020, the "volatile" relationship between appellant and A.C. led to changes in where appellant was staying, appellant's relationship status with A.C., and appellant's relationship with family members. *Id.* at 39. She testified it was "very hard to get an address" for appellant and to determine "who she was residing with." *Id.* at 41. She stated, "we were in a point of transition where [appellant] was still a minor, [but] she did not want to utilize the services of Franklin County and be subject to whatever rules there would be to live in a facility that they would provide, but she was also not under [her] mother's care or parents or kinship." *Id.* at 38.

**{¶ 32}** Hatem described her many visits with K.C. in her foster home. She stated that the home is "really set up around the children," with the living room essentially serving as a playroom. *Id.* at 45. She described K.C. as a "playful, comfortable child," *id.* at 44, who "will take me around and show me some of * * * her things," *id.* at 45. She described K.C.'s "affection for books and her toys" and stated that she is "really developing small motor skills." *Id.* According to Hatem, both foster parents are bonded to K.C. and that K.C. is bonded to them. She explained, "There's a lot of comfort and physical touch." *Id.* at 47.

**{¶ 33}** Hatem also described her observations of visits between K.C. and appellant, which she had attended on three or four occasions. She described the visits as "quiet" and stated that appellant focused her attention primarily on her cell phone rather than on K.C., although she did testify that, at one point, "they were doing things together on the cell phone." *Id.* at 49. She testified that K.C. behaved differently—was less rambunctious and playful—when visiting with appellant, as opposed to when Hatem observed her in the foster home. As to a bond between K.C. and appellant, Hatem stated, "There are no safety concerns, but there is not a comfort there that I see with the other adults in her life." *Id.* at 58.

{¶ 34} Hatem testified that K.C. is not old enough to understand the concept of permanent custody or to express her wishes directly, but Hatem recommended that the court grant FCCS's motion for permanent custody.

{¶ 35} After FCCS rested its case, appellant recalled caseworker Miller to testify. Miller had visited appellant's current residence twice, once in March and once in April 2023. In March, there were no obvious safety concerns with the home, but it was not furnished. The home had two bedrooms, one for K.C. and one for appellant, although appellant did not show Miller appellant's bedroom. There was an air mattress in the living room. When Miller returned in April, the kitchen was furnished, the air mattress was gone, but the only other furniture on the first floor was a single lawn chair in the dining room. Miller did not see upstairs on her second visit, as appellant stated there was someone up there. Appellant later told Miller that it was A.C. who was upstairs.

{¶ 36} FCCS learned from the property rental company that *only* A.C.'s name was on the lease. FCCS could not make a furniture bank referral because appellant was not the lessee. Miller provided appellant with information about homeless shelters, Choices shelter, Columbus Metropolitan Housing, and other low-to-no income housing opportunities. At the time, appellant was out of work, having left her original job at Wendy's and having not obtained her job at another Wendy's location.

{¶ 37} On August 4, 2023, the juvenile court issued its decision granting FCCS's motion for permanent custody. The court concluded that, under R.C. 2151.414(B)(1)(d), there was clear and convincing evidence that K.C. had been in FCCS's temporary custody for more than 12 months of a consecutive 22-month period and that, under R.C. 2151.414(B)(1)(a), K.C. could not and should not be placed with either parent within a reasonable time. The court further concluded that clear and convincing evidence demonstrated that granting permanent custody to FCCS was in K.C.'s best interest.

## III. ASSIGNMENT OF ERROR

{¶ 38} Appellant filed a timely notice of appeal, in which she asserts a single assignment of error: "The termination of parental rights was not supported by the weight of the evidence." (Appellant's Brief at ii.)

## IV. ANALYSIS

### A. R.C. 2151.414 and standard of review

{¶ 39} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Parental rights are not absolute though, as a parent's natural rights are subject to the child's ultimate welfare. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Accordingly, the state may terminate a natural parent's parental rights under certain circumstances, when termination is in the best interest of the child. *In re A.P.*, 10th Dist. No. 22AP-570, 2023-Ohio-2463, ¶ 9, citing *H.D.* at ¶ 10.

{¶ 40} R.C. 2151.414 governs the termination of parental rights in Ohio. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. "Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, 'by clear and convincing evidence, that it is in the best interest of the child' to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies." *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, ¶ 7. " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 41} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Z.C.* at ¶ 18. Appellant's arguments concern the weight of the evidence, so we apply the manifest weight of the evidence standard here. (Appellant's Brief at ii, 22, 26.)

{¶ 42} We may not reverse a judgment supported by competent, credible evidence going to all the essential elements of the case as being against the manifest weight of the evidence. *In re J.M.*, 10th Dist. No. 05AP-234, 2015-Ohio-3988, ¶ 7. When applying the

manifest weight standard to a judgment that grants permanent custody of a child to FCCS, we " ' "must make every reasonable presumption in favor of the judgment and the trial court's findings of fact." ' " *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37.  If the evidence is susceptible of more than one construction, we give it that interpretation which is most favorable to sustaining the trial court's judgment.  *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, citing *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

{¶ 43} The determination whether to grant permanent custody of a child to a public children services agency involves a two-step process.  *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18, citing *In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914, ¶ 6.  The juvenile court must first determine whether any factor set out in R.C. 2151.414(B)(1) applies.  As applicable here, those factors include, "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," R.C. 2151.414(B)(1)(a), and "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period," R.C. 2151.414(B)(1)(d).

{¶ 44} If the juvenile court concludes that one of the R.C. 2151.414(B)(1) factors applies, it must then determine whether a grant of permanent custody to the agency is in the child's best interest.  R.C. 2151.414(D)(1) offers guidance for evaluating the best interest of the child and requires the court to "consider all relevant factors, including but not limited to, the following":

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

The factors set out in R.C. 2151.414(E)(7) through (11) include: (1) whether the parent has been convicted of or pled guilty to various crimes, (2) whether the parent has repeatedly withheld medical treatment or food from the child, (3) whether the parent has repeatedly placed the child at a substantial risk of harm due to alcohol or drug abuse and has repeatedly rejected or refused to participate in alcohol or drug treatment, (4) whether the parent has abandoned the child, and (5) whether the parent has had his or her parental rights involuntarily terminated with respect to a sibling of the child.

### B. R.C. 2151.414(B)(1)

{¶ 45} After considering whether any factor under R.C. 2151.414(B)(1) applies, the juvenile court found that, under R.C. 2151.414(B)(1)(a), K.C. could not be placed with either parent within a reasonable time and that she should not be placed with either parent. It also found, under R.C. 2151.414(B)(1)(d), that K.C. has been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period prior to the permanent custody hearing. Appellant disputes the court's finding under R.C. 2151.414(B)(1)(a), but she does not dispute the court's finding under R.C. 2151.414(B)(1)(d). Because the juvenile court was only required to find applicable one ground under R.C. 2151.414(B)(1), *In re S.C-N.*, 10th Dist. No. 21AP-544, 2022-Ohio-3064, ¶ 62, and because it is undisputed that K.C. had been in the custody of FCCS for 12 or more months of a consecutive 22-month period and that R.C. 2151.414(B)(1)(d) was satisfied, we need not consider appellant's arguments regarding the juvenile court's finding that K.C. could not be placed with either parent within a reasonable period of time. *See, e.g., In re J.W.*, 10th Dist. No. 22AP-382, 2023-Ohio-1582, ¶ 40. Therefore, we need only consider whether there was clear and convincing evidence that an award of permanent custody to FCCS was in K.C.'s best interest.

### C. Best interest determination

{¶ 46} An agency seeking permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 19, citing *In re B.C.*, 141 Ohio

St.3d 55, 2014-Ohio-4558, ¶ 26. R.C. 2151.414(D)(1) sets out a non-exhaustive list of factors the juvenile court must consider in determining the best interest of the child. "There is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. An appellate court "must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors." *A.M.* at ¶ 31.

{¶ 47} In its decision granting FCCS's motion for permanent custody, the juvenile court expressly addressed each of the best interest factors set out in R.C. 2151.414(D)(1), with specific reference to the evidence presented at trial.

{¶ 48} R.C. 2151.414(D)(1)(a) requires a court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." Both caseworker Miller and GAL Hatem testified about K.C.'s interactions with appellant and with her foster parents. Based on that testimony, the trial found that K.C. is bonded with and comfortable with her foster parents. Both Miller and Hatem indicated that K.C. is more bonded with her foster parents than with appellant. Although Miller had observed a bond between K.C. and appellant during a visit in August 2022, she concluded from her observation of a subsequent visit, after a period in which visitation had been suspended, that K.C. was no longer bonded with appellant. The court noted that K.C. had been in the same foster home for 32 months, since she was two months old, and that the foster parents want to adopt her should permanent custody be granted.

{¶ 49} R.C. 2151.414(D)(1)(b) requires a court to consider "[t]he wishes of the child, expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." The juvenile court agreed with Hatem that, because of her young age, K.C. could not yet understand the concept of permanent custody and that she, therefore, had limited capacity to express her wishes, but the court acknowledged Hatem's recommendation that the court grant permanent custody to FCCS. The court did state, "to the extent [K.C.] is able to express her contentment in the current placement and prospective adoptive home, the evidence established that the child is bonded to [the foster]

family and comfortable and would be content remaining there." (Aug. 4, 2023 Decision & Jgmt. Entry at 10.)

{¶ 50} R.C. 2151.414(D)(1)(c) requires a court to consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period." As stated above, the court found—and it is undisputed—that K.C. had been in temporary agency custody for at least 12 months of a consecutive 22-month period.

{¶ 51} R.C. 2151.414(D)(1)(d) requires a court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody." Based on the evidence presented, the juvenile court concluded both that K.C. needs a legally secure permanent placement and that "[n]ow, thirty-two months after [K.C.'s] removal, [appellant] still has not sufficiently remedied concerns to allow for reunification now or any time in the near future." (Aug. 4, 2023 Decision & Jgmt. Entry at 10.) The court specifically noted appellant's failure to successfully complete mental health and domestic violence services, the fact that appellant's current residence is leased to A.C., and appellant's lack of candor and lack of willingness to engage in services offered to her.

{¶ 52} R.C. 2151.414(D)(1)(e) requires the court to consider whether any of the factors listed in R.C. 2151.414(E)(7) through (11) apply with respect to the parents and child. The court found that R.C. 2151.414(E)(10) ("[t]he parent has abandoned the child") applies, because K.C.'s father remains unknown.

{¶ 53} Appellant does not dispute that the juvenile court expressly considered each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e), but she argues that the court "failed to give sufficient weight to the many hurdles" she faced, including indications that she was sex-trafficked as a child and was herself a juvenile who lacked significant family support, and found herself in an abusive relationship while pregnant with K.C. Based on the juvenile judge's discussions with and questioning of appellant, Miller, and Hatem, particularly the first day of trial, the court was not only cognizant of appellant's struggles, but was particularly interested in ways FCCS could help her to overcome those struggles and in ways appellant could position herself before the second day of trial to avoid termination of her parental rights. But the court was also faced with appellant's

inconsistent testimony, history of untruthfulness and evasiveness in dealing with FCCS, particularly with respect to the existence of domestic violence and her housing situation, and her refusal to accept services when offered to her.

{¶ 54} Appellant also argues that the juvenile court failed to consider "significant progress" she had made on her case plan and that there had been no complaints about her parenting ability based on her appropriate interactions with K.C. during visitation. Appellant contends the juvenile court should have afforded her additional time to reunify with K.C. (Appellant's Brief at 26-27.)

{¶ 55} Appellant undisputedly made some progress on her case plan. Miller testified that appellant had satisfactorily obtained employment and a legal income. Appellant also completed a mental health evaluation and, for a period, attended counseling sessions, even if counseling was ultimately terminated for appellant's lack of engagement. On the other hand, appellant did not engage in domestic violence services and, in fact, denied that she was a victim of domestic violence until the second day of trial. As of the first day of trial, more than two years after K.C. had been removed, appellant had not obtained safe and stable housing. Although she had obtained an apartment as of the second day of trial, concerns remained, because the lease was in A.C.'s name, a fact that appellant affirmatively attempted to hide from FCCS.

{¶ 56} Even assuming, as she claims, appellant made significant progress on her case plan throughout the course of this case, " 'R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan,' as substantial compliance with a case plan is 'but one of many factors the court may find relevant * * * in rendering its judgment.' " *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 57, quoting *Brooks*, 2004-Ohio-3887, ¶ 62-63. "[A] finding that a parent has satisfied some case plan goals does not necessarily equate to a finding that the parent has the ability to assume custody of a child." *In re L.R.-L.*, 10th Dist. No. 22AP-381, 2023-Ohio-2071, ¶ 44, citing *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 31

{¶ 57} With respect to appellant's compliance or noncompliance with her case plan, the juvenile court noted appellant's failure to successfully complete mental health and domestic violence services and the fact that her current residence is leased to A.C., not to

appellant. A.C.'s name on the lease for appellant's home was concerning because, throughout the case, appellant has provided inconsistent explanations with respect to the existence of domestic violence against her by A.C. and with respect to her relationship status with A.C.. At the second day of trial, appellant admitted that she had been the victim of domestic violence by A.C. in the past. Moreover, appellant concealed from FCCS both that she was pregnant with A.C's child and that A.C was listed on the lease of the apartment she moved into in March 2023. The juvenile court noted appellant's lack of candor and refusal to take advantage of services and resources offered to her. Noncompliance with a case plan, despite opportunities to do so, is a ground for termination of parental rights. *In re M.L.J.*, 10th Dist. No. 04AP-152, 2004-Ohio-4358, ¶ 8, citing *In re Brofford*, 83 Ohio App.3d 869, 878 (10th Dist.1992), and *In re Bailey*, 11th Dist. No. 2001-G-2340, 2001 Ohio App. LEXIS 3293 (July 20, 2001).

**{¶ 58}** Upon review, we conclude that the evidence presented at trial supports the juvenile court's findings under the R.C. 2151.414(D)(1) best-interest factors and that clear and convincing evidence supports its conclusion that granting permanent custody to FCCS was in K.C.'s best interest. Accordingly, we overrule appellant's assignment of error.

## V. CONCLUSION

**{¶ 59}** Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted FCCS's motion for permanent custody of K.C.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.